*30 OPINION OF THE COURT
Titone, J.
 In this consolidated appeal, the primary issue is whether a person who has been pressured into resigning from employment after "failing” a polygraph test may maintain an action for damages against an examiner who allegedly conducted the test in a negligent manner. Also at issue is whether this plaintiff is entitled to be paid a bonus under the specific terms of his employer’s bonus plan. We hold that neither of plaintiff’s claims is legally viable and that both were properly dismissed.
Plaintiff had been employed by defendant United Parcel Service (UPS) since 1972. In the fall of 1981, two bags containing money were determined to be missing from the UPS office in Rochester, where plaintiff was the center manager. UPS retained defendant Doyle Detective Bureau, Inc., to assist in the investigation of the missing bags. As part of this investigation, several UPS employees, including plaintiff, were subjected to polygraph lie detector tests administered by the individual defendants Griffin and Mahoney. According to Griffin’s and Mahoney’s reports, plaintiff, who was tested on two separate occasions, showed considerable stress and deception during both tests. Griffin’s report concluded that plaintiff was "directly involved in theft.” After having been apprised of the test results, plaintiff was allegedly forced to resign on November 13, 1981.
Before these events took place, plaintiff had been approved for and scheduled to receive a Participation Notice for a bonus, payable in the early spring of 1982, to cover the fiscal period ending on September 30, 1981. The Participation Notices were not distributed, however, until November 15, 1981, two days after plaintiff had left the company. Because its written bonus plan expressly provided that bonus rights accrue upon receipt of a Notice of Participation, UPS took the position that plaintiff, who was not given a Notice, was not entitled to receive a bonus.
In May of 1983, plaintiff commenced an action against UPS, Doyle and Griffin, among others, seeking damages for his lost employment and mental anguish (action No. 1). On defendants’ motion for summary judgment, which was made after discovery was had, the trial court dismissed the causes of action based on defamation, intentional infliction of emotional distress and breach of an alleged oral agreement, but left *31 standing the two remaining causes of action, which were asserted against Doyle and Griffin and were based on the alleged negligent administration of the lie detector tests. The court also denied a cross motion by plaintiff to amend his complaint by adding a new cause of action for recovery of the 1980-1981 bonus plaintiff allegedly should have received, concluding that the claim lacked substantive merit. This decision was not fatal to plaintiff’s claim, however, since plaintiff had previously commenced a second action against UPS on January 6, 1988, claiming entitlement to a bonus (action No. 2). This second action was disposed of in an order of dismissal dated October 4, 1988, which was predicated in part on the court’s earlier conclusion that the claim lacked merit and in part on its determination that the claim was time barred.
On plaintiff’s appeal in action No. 2, the Appellate Division affirmed, without opinion. On appeal by defendants Doyle and Griffin in action No. 1, the Appellate Division modified the trial court’s order by dismissing the remaining negligence causes of action against those defendants. The court held that Doyle owed no duty of care to plaintiff because he was not "part of a limited group whom Doyle should have expected to rely upon its report.” (151 AD2d, at 985.) Additionally, the court held, General Business Law § 74 (1) (b), which permits civil recovery for "wilful, malicious and wrongful act[s]” of licensed private investigators, does not give rise to a cause of action for negligent investigation. Following the Appellate Division’s decisions, this court granted plaintiff leave to take a further appeal in both actions.
Action No. 1
Resolution of the appeal in action No. 1 requires us to decide whether a person who has been made the subject of a polygraph lie detector test may maintain a negligence action against the party who conducted the test.* The parties have focused on the question of whether plaintiff may maintain the *32 action even though defendants Doyle and Griffin were retained by UPS, and both sides have made a number of arguments concerning the applicability of the line of cases represented by Ossining Union Free School Dist. v Anderson LaRocca Anderson (73 NY2d 417), Credit Alliance Corp. v Andersen & Co. (65 NY2d 536), White v Guarente (43 NY2d 356), Glanzer v Shepard (233 NY 236) and Ultramares Corp. v Touche (255 NY 170). This line of cases, however, specifically concerns the extent to which a party who has negligently misrepresented facts may be held liable to those who have relied to their detriment on the misrepresentations. The cited cases are of limited analytical utility in resolving a case such as this, where the injury arose not as a result of the injured’s reliance on negligently made statements but rather as a result of the direct impact that those statements had on the injured party’s business and personal life. In that regard, this case is more analogous to one in which the test subject suffered physical injury by virtue of a negligently administered test than it is to the fact pattern presented in Ossining and its predecessors (cf., People v Hamilton, 125 AD2d 1000 [civil damage suit on behalf of women victimized by "unnecessary touching” and unnecessary, sexually suggestive questioning by polygraph examiner]).
Indeed, if plaintiff had sustained physical injury from the test rather than the less tangible reputational injury he sustained, there would be no question of his right to maintain a cause of action against the examiner, notwithstanding the absence of a relationship of privity. The problematic aspect of this case is not the absence of a contractual relationship between plaintiff and defendants, but rather the nature of the harm for which plaintiff seeks a remedy.
Injuries to an individual’s personal and professional reputation such as the injuries alleged here have long been compensated through the traditional remedies for defamation. Of course, this plaintiff cannot avail himself of those remedies, since they are circumscribed by rules of qualified privilege that, in closely analogous circumstances, foreclose recovery in *33 the absence of a showing of malice or other culpable conduct beyond the level of ordinary negligence (see, Kasachkoff v City of New York, 68 NY2d 654; Sondak v Dun & Bradstreet, 39 Misc 2d 13 [applying qualified privilege to credit reporting service’s activities]; Houston v TRW Information Servs., 707 F Supp 689 [same]; cf, General Business Law § 74 [1] [b]). Plaintiff’s recovery thus depends upon our willingness to recognize a new tort cause of action, or to adopt substantial modifications of the existing defamation remedies. Whether we should do so by recognizing a remedy in tort is a question that is best resolved by reference to the relevant judicial and social policy considerations.
As to the social considerations, there can be little doubt that the use and abuse of lie detector tests in the workplace is a significant matter meriting government attention. On the one hand, there is a substantial practical demand for this technology in the private employment marketplace. The use of the polygraph in private industry has increased dramatically in the past decade (see, Note, Lie Detectors in the Workplace: The Need for Civil Actions Against Employers, 101 Harv L Rev 806, n 1 [hereinafter Note, Lie Detectors in the Workplace]). By 1987, it was estimated that approximately two million lie detector tests were being administered annually (Senate Report No. 100-284, reprinted in 1988 US Code, Cong & Admin News 726, 728 [hereinafter Senate Report]).
Reasons have been advanced for curtailment or regulation of these tests. Despite their widespread use, serious questions persist about the accuracy and scientific validity of these tests (see, id., at 728-731; Note, Lie Detectors in the Workplace, op. cit., at 807-813; Scientific Validity of Polygraph Testing: A Research Review and Evaluation — A Technical Memorandum, Washington, D.C.: US Cong, Office of Technology Assessment, OTA-TM-H-15, Nov. 1983, at 102). Indeed, a committee of the American Medical Association recently concluded that the polygraph is capable of providing evidence of honesty or deception by the test subject in a percentage of cases that is statistically only slightly better than pure chance (see, Senate Report, op. cit., at 728-730).
Further, the potential for substantial harm resulting from the misuse of lie detector tests has been recognized. The indiscriminate use of questionable test results can permanently tarnish the reputation of the test subject and lead to unjust loss or denial of employment (see, id., at 734). The *34 potential for mischief is especially acute in the employment arena, because, given the high rate of employee theft in some industries, employers will often prefer to err on the side of caution by terminating employees, or not hiring applicants, where a lie detector test, accurate or otherwise, raises questions about the employee’s honesty (see, Note, Lie Detectors in the Workplace, op. cit., at 812). Additionally, the false aura of validity generated by these tests’ supposed scientific basis may lead employers to repose undue confidence in their results.
The conclusion that some governmental oversight and regulation may be desirable, however, does not necessarily lead to the further conclusion that a new tort cause of action should be established to address the problem. As we have observed in other contexts, some social problems "are best and more appropriately explored and resolved by the legislative branch of our government” (Murphy v American Home Prods. Corp., 58 NY2d 293, 302), particularly where, as here, there are competing interests at stake. In such circumstances, "[t]he Legislature has infinitely greater resources and procedural means to discern the public will, to examine the variety of pertinent considerations, to elicit the views of various segments of the community that would be directly affected * * * and to investigate and anticipate the impact of imposition of such liability.” (Id.) In the analogous area of credit reporting, the problems of negligence and misuse have been addressed through legislation at the Federal and State levels (see, Federal Fair Credit Reporting Act, 15 USC § 1681 et seq.; Fair Credit Reporting Act, General Business Law art 25; see especially, General Business Law §§ 380-/, 380-m [civil liability for willful and negligent noncompliance]).
Furthermore, our State Legislature has not been completely silent on the question of lie detector tests and has adopted some limited remedial measures. For example, New York prohibits credit reporting agencies from retaining records of any lie detector tests that an individual may have taken (General Business Law § 380-j [g]). Additionally, New York has long provided for civil recovery in cases involving "wilful [or] malicious” misconduct by licensed detective agencies (General Business Law § 74 [1] [b]). Under Labor Law §§ 733-739, psychological stress evaluators, which purport to measure a subject’s truthfulness "on the basis of vocal fluctuations or vocal stress” (Labor Law § 733 [4]) are banned from the workplace, and civil damages are available to those injured by their use. Significantly, no similar measure has been adopted by our *35 State Legislature in relation to conventional polygraph tests, which are based on fluctuations in blood pressure, pulse beat, breathing and galvanic skin responses (see, Scott v Transkrit Corp., 91 AD2d 682; Nothdurft v Ross, 104 Misc 2d 898, 900, affd 85 AD2d 658). The Legislature’s choice to regulate the use of some lie detector devices in certain limited contexts suggests that this court should stay its own hand and refrain from crafting additional remedial measures (see, Sheehy v Big Flats Community Day, 73 NY2d 629, 635-636).
Finally, to the extent that there is a perceived need for more extensive government intervention, that need has been filled by the recently adopted Federal Employee Polygraph Protection Act of 1988 (29 USC § 2001 et seq.). Enacted in 1988 (Pub L 100-347, 102 US Stat 646), this comprehensive legislation prohibits private employers from "directly or indirectly * * * requiring], requesting], suggesting], or causing] any employee or prospective employee to take or submit to any lie detector test” or even making use of the results of such a test (29 USC § 2002 [1]), except in certain narrowly defined circumstances. Violations of the statutory prohibition may not be waived and are punishable by civil penalties, as well as injunctions and private actions for damages, which may be commenced in either Federal or State court (29 USC § 2005). In situations such as that presented in this case, where "an ongoing investigation involving economic loss” to the employer is involved, polygraph tests may be conducted, but only if certain conditions, including a showing of "reasonable suspicion”, are satisfied (29 USC § 2006 [d]). Even in these cases, however, the test results may not be used as a basis for adverse action unless there is "additional supporting evidence”, the examinee is afforded certain specified procedural and substantive rights and the examiner has the delineated qualifications (29 USC § 2007 [a] [1]; [b]-[c]). The statute also imposes stringent restrictions on the disclosure of polygraph test results (29 USC § 2008).
Although Congress made clear that the Federal statutory scheme was not intended to preempt more restrictive State legislation (29 USC § 2009), this detailed, far-reaching act greatly diminishes the strength of the arguments for recognizing a new tort remedy at the State level. Most of the concerns of those who have urged the creation of such a remedy (see, e.g., Note, Lie Detectors in the Workplace, op. cit.) have been addressed, directly or indirectly, by the Federal statute. It is true that the statute, which focuses on restricting the very use *36 of these tests, does not squarely address the discrete problem of their negligent administration (but cf., 29 USC § 2007 [c] [regarding examiner’s qualifications]). However, by imposing such stringent rules for the use and disclosure of polygraph test results, the Federal statute will presumably curtail the potential for harm to innocent employees that the use of these tests, negligent or otherwise, entails.
For these reasons, and under the circumstances of this case, we decline to recognize a cause of action based on plaintiffs allegations that the polygraph tests he took were negligently administered. Accordingly, plaintiff cannot maintain a claim against defendants Doyle and Griffin, and the complaint against them was properly dismissed.
Action No. 2
Contrary to the conclusion of the trial court, plaintiffs claim for payment of the 1980-1981 bonus, which was not formally interposed until he served a new summons and complaint on UPS in January of 1988, is not time barred. A claim of this nature must be deemed to have accrued on the date that the plaintiff claims the breach of the employer’s alleged obligation occurred, without regard to whether the claim has merit or whether the claimant has even accurately identified the event which would have triggered his rights, if such rights existed.
The gist of plaintiffs claim in this case is that, notwithstanding his failure to receive a Participation Notice in November of 1981, plaintiff should have been given the bonus for which he had previously been approved at the scheduled time, i.e., February of 1982. Because his claim was framed in this manner, it must be deemed to have accrued not when the Participation Notice was withheld, but rather at the time when the distribution would otherwise have been made, since that was the point at which, according to plaintiffs allegations, defendant UPS breached its duty to him. Thus, service of the summons and complaint on January 6, 1988, was timely.
Plaintiffs claim must ultimately fail, however, because, as the trial court held, it lacks substantive merit. An employee’s entitlement to a bonus is governed by the terms of the employer’s bonus plan (see, Bayer v Oxford Univ. Press, 270 App Div 586, affd 296 NY 780).
At common law, "a corporation proposing to give a sum for *37 the benefit of any person or any set of persons has the right to fix the terms of his bounty, and provide under what circumstances the gift shall become vested and absolute.” (McNevin v Solvay Process Co., 32 App Div 610, 612, affd 167 NY 530.) Here, the UPS bonus plan was described in informal memorandum to the upper-level managers responsible for selecting participants. After an initial statement that "[a] new determination of membership [in the plan] is made each year without regard to membership in prior years”, the memorandum went on to state that "[membership in the Plan for any year becomes effective only when the member receives a UPS Managers Incentive Plan Participation Notice” (emphasis supplied). Further, "[n]o part of the UPS Managers Incentive Plan earnings accrues to or becomes a right of any individual member until he is given a Participation Notice.”
Thus, contrary to plaintiffs contention that the delivery and receipt of a participation notice were mere "ministerial acts,” the explicit terms of the employer’s plan made those events crucial to the vesting of the employee’s bonus payment. Accordingly, although plaintiff had been approved for a bonus payment before he left the company, his employer retained the right not to make any such payment.
Accordingly, in actions No. 1 and No. 2, the orders of the Appellate Division should be affirmed, with costs.
Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Hancock, Jr., and Bellacosa concur.
Orders affirmed, with costs.

 Plaintiff did not bear his burden of proving that defendant Doyle is collaterally estopped from litigating this issue because of a prior judicial ruling in a case arising out of the same theft investigation involving a different UPS employee. It is true, as plaintiff notes, that in Zampatori v United Parcel Serv. (125 Misc 2d 405), the court denied a motion for summary judgment by Doyle, without prejudice to renewal, after concluding in principle that the plaintiff in that case could maintain an action against Doyle for negligent administration of a polygraph test, even in the absence of privity. However, plaintiff Hall’s bare allegation in this case that "a *32 verdict was [subsequently] rendered against Doyle” in the Zampatori action leaves unclear whether a final judgment necessarily encompassing this specific determination ultimately resulted — a matter which Hall is obligated to prove (see, Capital Tel. Co. v Pattersonville Tel. Co., 56 NY2d 11, 19; Schwartz v Public Adm’r of County of Bronx, 24 NY2d 65, 73; see generally, 5 Weinstein-Korn-Miller, NY Civ Prac f 5011.23, at 50-151 — 50-153; If 5011.26, at 50-168).