Jose A. SANTIAGO, Plaintiff,

v.

GREYHOUND LINES, INC., Laboratory Specialists, Inc., Dominic J. Belmonte d/b/a Albany Industrial Physicians, Defendants.

No. 89–CV–876.

United States District Court, N.D. New York.

Jan. 30, 1997.

As Amended Feb. 21, 1997.

Delorenzo, Gordon, Pasquariello, Weiskope & Harding (Thomas E. Delorenzo, of counsel), Schenectady, NY, for Plaintiff.

Seyfarth, Shaw, Fairweather & Geraldson (Amy Hartman, of counsel), Chicago, IL, for Defendant Greyhound Lines, Inc.

Kullman, Inman, Bee, Downing & Banta (Charles H. Hollis, of counsel), New Orleans, LA, for Defendant Laboratory Specialists, Inc.

Levene, Gouldin & Thompson (David L. Niefer, of counsel), Binghamton, NY, for Defendant Belmonte d/b/a Albany Industrial Physicians.

### MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Defendants move for summary judgment in this case concerning the repercussions of an allegedly botched drug urinalysis. The

court entertained oral argument on October 11, 1996 at its regular motion term in Syracuse, New York. The following constitutes the memorandum-decision and order of the court.

## I. BACKGROUND

The plaintiff in this matter is a bus driver by profession, having been first hired by the Trailways company in 1980. The defendant Greyhound Lines acquired Trailways in July 1987. At that time plaintiff was based out of New York City. Soon after the buy-out plaintiff requested and was granted a transfer to Albany.

On September 16, 1988 plaintiff reported to the defendant Dr. Dominic J. Belmonte, who at that time maintained an occupational medicine practice under the name of Albany Industrial Physicians. Plaintiff was to undergo a routine physical examination and drug screen. Plaintiff had been similarly examined and tested when he was initially hired by Trailways in 1980, and every two years thereafter. Dr. Belmonte regularly performed these physicals and urinalyses for Greyhound drivers in the Albany area. Greyhound did not provide a procedures manual for drug tests performed on their employees. Although Dr. Belmonte's office collected the urine samples, they were commonly sent to various outside laboratories for testing. Some of those labs provided Dr. Belmonte with their own procedures manuals—it appears that the codefendant Laboratory Specialists, Inc. ("LSI") did not.

When a Greyhound employee came into Dr. Belmonte's office, the employee brought a chain of custody form, and plaintiff did so on that day. The top portion was completed by plaintiff's supervisor, District Manager Michael Hoffman. The middle portion was to be completed by the office collecting the urine sample (with a signature line for the driver producing the specimen), and the bottom portion was for the testing laboratory's results. The employee would check in with the receptionist, but he was not required to furnish photographic identification. A brief physical would be performed. Greyhound's testing laboratory, the defendant LSI, had provided Dr. Belmonte with some testing kits. The employee would fill a collection cup in a bathroom and then bring the cup to a desk where the urine was collected. The specimen was poured from the cup into a screw cap bottle. The bottle would be screwed shut, and then secured with tamper evident tape. A label or seal of some sort would be attached to the bottle. The employee was supposed to initial the label in the presence of one of the doctor's employees, who would put identification information on the label. The whole bottle would be placed in a plastic bag which would also be sealed with tamper evident tape. The chain of custody form would then be signed by the Greyhound employee and witnessed by one of the doctor's employees. The bag was put in a mailer along with the form, then placed in a lockbox for pickup by a courier.

In plaintiff's case, everything went according to the normal procedure until he took the cup with the specimen sample in it out of the bathroom to the collection desk. Plaintiff arrived at 3:30 PM and was examined by a physician's assistant at Dr. Belmonte's office. After voiding in the cup, he took the specimen to the collection desk. Dr. Belmonte's office manager was at the desk and plaintiff put the cup down and left. It is disputed whether there were several cups of specimen there, or just the plaintiff's. After plaintiff left, Anthony Chouffi, one of Dr. Belmonte's employees who was responsible for collecting urinalysis samples, relieved the office manager and noticed that she had neglected to have plaintiff initial the bottle or complete the chain of custody form. Chouffi signed Santiago's name in the appropriate space then signed his own name in the witness space. The sample was put in a special mailer provided by LSI and sent out the following Monday, September 19, 1988.

LSI, a Louisiana laboratory, had an agreement with Greyhound to perform all their urinalysis testing. LSI received the mailer with the chain of custody form which had been completed by Chouffi and the sealed plastic bag containing the sealed bottle of urine. There is no contention that LSI's testing was faulty. The sample tested positive for cocaine metabolites.

On October 4, 1988, the Greyhound district manager received the positive test results and called plaintiff into his office to confront him with it. Plaintiff discovered that the name signed was not his own. Plaintiff was sent to Dr. Belmonte's for another drug screen that same day, which eventually came back negative. The plaintiff maintains that he did not ever use cocaine, but that his wife and relatives did, and he attended parties where cocaine was used. Before the negative results to the second test came back, plaintiff was fired, on October 7, 1988. Plaintiff filed a grievance through his union. Ultimately, it appears the union secured an offer of reinstatement for the plaintiff on March 15, 1989. Greyhound also agreed to pay 75 percent of the income plaintiff lost between his discharge and the offer of reinstatement.

Plaintiff turned down the offer and commenced suit. Plaintiff is suing Greyhound on the following theories: counts (1) and (3)—national origin/ethnic/race discrimination under federal and state law; (2) breach of employment contract; and (4) and (5), two negligence/wrongful discharge theories. Plaintiff is suing LSI and Dr. Belmonte on negligence theories, counts (6) and (8) of the amended complaint. Dr. Belmonte is also being sued for negligent misrepresentation, count (7). All three defendants have cross-claimed for contribution or indemnification. Analysis commences below.

## II. DISCUSSION

The standards for granting summary judgment pursuant to Fed.R.Civ.P. 56 are governed by a familiar triumvirate of 1986 Supreme Court cases. The movant bears the initial burden of persuading the court that the record demonstrates "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Genuine issues exist if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106

S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Once a movant has carried her initial burden, the respondent "must do something more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). In evaluating a summary judgment motion, the court must view the facts in the light most sympathetic to the nonmovant. *Matsushita*, 475 U.S. at 587, 106 S.Ct. at 1356 (quotation omitted). The district judge's inquiry is whether a triable issue exists with respect to the claim being moved upon—that is, whether there is enough of a material dispute over key facts that the finder of fact could reasonably decide either way. *See Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511.

The motions of the various defendants are treated seriatim, starting with Dr. Belmonte's.

### A. Dr. Belmonte

■ Dr. Belmonte argues in the first instance that plaintiff's negligence theories against him must fail because as a matter of law, a medical office owes no duty to a patient to perform a urinalysis competently. A finding of duty is naturally a prerequisite to negligence liability in New York. *Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 342, 162 N.E. 99, 99–100 (N.Y.1928). Duty is defined by the foreseeability of the plaintiff and by policy factors (including of course the relevant precedents), and is a legal question for the court to decide. *Burke v. Warren County Sheriff's Dep't*, 916 F.Supp. 181, 185–86 & n. 4 (N.D.N.Y.1996).

■ For support of the specific proposition, Dr. Belmonte cites *Hall v. United Parcel Service*, a case in which the New York Court of Appeals refused to recognize a cause of action for the negligent administration of a polygraph test by a detective agency. 76 N.Y.2d 27, 556 N.Y.S.2d 21, 555 N.E.2d 273 (1990).[1] In *Hall* UPS hired a

---

1. *But cf. People by Abrams v. Hamilton*, 125 A.D.2d 1000, 511 N.Y.S.2d 190 (1996) (administration of polygraph may be unlawful sex discrimination); *Zampatori v. United Parcel Service*,

125 Misc.2d 405, 479 N.Y.S.2d 470 (N.Y.Sup.Ct. 1984) (action sounds in negligent misrepresentation theory). The *Zampatori* case apparently arose out of the same factual aggregate as *Hall*,

detective bureau to investigate a theft. The plaintiff and other UPS employees consented to undergo a polygraph examination. Plaintiff flunked the test and was forced to resign. The plaintiff brought suit, asserting inter alia that the detective bureau negligently administered the polygraph test. In a short memorandum the Fourth Department held that the detective agency owed no duty to plaintiff. 151 A.D.2d 984, 544 N.Y.S.2d 250 (N.Y.App.Div.1989). After a much more comprehensive duty analysis, the Court of Appeals affirmed.

The *Hall* court initially observed that "[t]he problematic aspect of this case is not the absence of a contractual relationship between plaintiff and defendants, but rather the nature of the harm for which plaintiff seeks a remedy." 76 N.Y.2d at 32, 556 N.Y.S.2d at 24, 555 N.E.2d at 276. The nature of the harm for which the plaintiff was seeking relief—*viz.* injury to personal and professional reputation—was traditionally redressed through the tort of defamation. *Id.* Plaintiff however was precluded from asserting that cause of action because absent a showing of actual malice the detectives had a qualified privilege to disclose the polygraph results to the employer. 76 N.Y.2d at 32–33, 556 N.Y.S.2d at 24–25, 555 N.E.2d at 276–77.

Finding little helpful precedent, the Court of Appeals resorted to policy factors to determine whether a new cause of action should be recognized. Social considerations did raise concern about the use of polygraph tests in the employment context. But Judge Titone, writing for the court, did not find those concerns dispositive:

> The conclusion that some governmental oversight and regulation may be desirable, however, does not necessarily lead to the further conclusion that a new tort cause of action should be established to address the problem.

76 N.Y.2d at 34, 556 N.Y.S.2d at 25, 555 N.E.2d at 277. The task of ameliorating social problems relating to the use of polygraph testing in employment situations was one best left to the legislature. The Hall court found significant the fact that several statutes provided some relief to persons aggrieved by unreliable polygraph examinations. *See* N.Y.Gen.Bus.Law § 74(1)(b) (McKinney 1988) (causes of action for the "wilful, malicious and wrongful" acts of private investigators allowed); N.Y.Gen.Bus. Law § 380–j(g) (McKinney 1996) (consumer credit reporting agencies cannot rely on polygraph or other lie detector tests). Even more persuasive was the lack of reference to polygraph tests in the labor code, despite the fact that "psychological stress evaluator" exams are expressly prohibited. *See* N.Y.Lab. Law §§ 734(1) & 735(1) (McKinney 1988). Applying the familiar maxim of *expressio unius est exclusio alterius*, the Hall court opined that the state legislature's proscription of some types of lie detectors, but not all, "suggests that this court should stay its own hand and refrain from crafting additional remedial measures." 76 N.Y.2d at 34–35, 556 N.Y.S.2d at 26, 555 N.E.2d at 278.

Finally, the Court of Appeals found the Employee Polygraph Protection Act of 1988, Pub.L. 100–347, 102 Stat. 646 (codified at 29 U.S.C. §§ 2001–2009), particularly relevant to the decision of whether or not to recognize a new tort. That Act places many substantive restrictions on the use of polygraphs in the workplace, and authorizes civil and injunctive actions by the Secretary of Labor and private actions by aggrieved employees to enforce its provisions. The existence of this legislation strongly influenced the Court of Appeals to disapprove of the recognition of a new tort remedy.

The Supreme Court of Texas relied partially on Hall in holding that a drug tester retained by an employer to screen a potential employee owes no duty to that employee to warn her about the possible effects of consuming poppy seeds prior to the test. *SmithKline Beecham Corp. v. Doe,* 903 S.W.2d 347, 351–54 (Tex.1995). The United States Court of Appeals for the Fifth Circuit subsequently interpreted *SmithKline* as support for the proposition that under Texas law the drug tester owes no duty of reasonable

but involved a different UPS employee. *Hall,* 76 N.Y.2d at 32 n. *, 556 N.Y.S.2d at 24, 555 N.E.2d at 276.

care to the employee. *Willis v. Roche Biomedical Labs., Inc.,* 61 F.3d 313, 316 (5th Cir.1995). It should be noted that in both of these cases the laboratory performing the urinalysis was also responsible for collecting the sample, in contrast to the instant case.

Authorities from other jurisdictions are mixed. The intermediate appellate courts of the state of Louisiana appear to disagree on whether an employee in plaintiff Santiago's position should be able to recover from a drug test administrator. *See SmithKline,* 903 S.W.2d at 351–52. Dr. Belmonte's codefendant, LSI, has convinced one Louisiana court to hold that a testing laboratory has no duty to competently analyze the urine of a plaintiff situated similarly to Santiago. *Herbert v. Placid Refining Co.,* 564 So.2d 371, 374 (La.Ct.App.), *writ denied,* 569 So.2d 981 (La.1990). The *Herbert* court analogized the action to one of negligent interference with contract, a tort not recognized in Louisiana. LSI has been less successful with two other intermediate courts. *Nehrenz v. Dunn,* 593 So.2d 915, 917 (La.Ct.App.1992); *Elliott v. Laboratory Specialists, Inc.,* 588 So.2d 175, 176 (La.Ct.App.1991), *writ denied,* 592 So.2d 415 (La.1992); *Lewis v. Aluminum Co. of Am.,* 588 So.2d 167, 170 n. 3 (La.Ct.App. 1991), *writ denied,* 592 So.2d 411 (La.1992). *Nehrenz, Elliott,* and *Lewis* were ostensibly distinguished from *Herbert* on the grounds that the last case did not involve a negligence charge; yet another Louisiana court has characterized this interpretation of *Herbert* as "doubtful," and this court concurs. *Carter v. Smith,* 607 So.2d 6, 8 (La.Ct.App.1992). In *Lewis* and *Nehrenz* LSI analyzed specimens collected by other offices. In *Elliott* and *Herbert* LSI both collected the samples and tested them.

Maine's state court of last resort has declined to recognize any tort theory available to a plaintiff situated similarly to Santiago. *Devine v. Roche Biomedical Labs., Inc.,* 637 A.2d 441, 447–48 (Me.1993) (employer was the collector). The Eastern District of Pennsylvania has also refused to admit such a cause. *Caputo v. Compuchem Labs., Inc.,*

Civ. A. No. 92–6123, 1994 WL 100084, at *3 (E.D.Pa. Feb. 23, 1994), *aff'd,* 37 F.3d 1485 (3d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 733, 130 L.Ed.2d 636 (1995) (defendant tested but did not collect). Intermediate appeals courts in Illinois and Massachusetts, however, have allowed similar plaintiffs to proceed on negligence claims. *Stinson v. Physicians Immediate Care, Ltd.,* 269 Ill. App.3d 659, 646 N.E.2d 930, 934, 207 Ill.Dec. 96, 100 (Ill.App.Ct.1995) (defendant was collector and tester); *O'Connor v. SmithKline Bio–Science Labs., Inc.,* 36 Mass.App.Ct. 360, 631 N.E.2d 1018, 1020 (Mass.App.Ct.), *review denied,* 418 Mass. 1106, 639 N.E.2d 1082 (Mass.1994) (defendant only tested sample; facts indicate chain of custody dispute). Cases from trial and intermediate appellate courts in Missouri, Ohio, and Delaware suggest that the cause of action is an available avenue for relief in the right circumstances. *Irwin v. Wal–Mart Stores, Inc.,* 813 S.W.2d 99, 102 (Mo.Ct.App.1991) (summary judgment to defendant on laboratory on absence of factual issues); *Hall v. Bioquest Labs., Inc.,* Civ. A. No. 87A–JL3, 1991 WL 138362 (Del.Super.Ct. June 17, 1991); *see Powell v. Bethesda Hosp., Inc.,* 42 Ohio App.3d 164, 537 N.E.2d 711 (Ohio Ct.App.1988) (lab dismissed on lack of in personam jurisdiction).

It is fair to say the case authorities are inconsistent.[2] And the *Hall* case, while persuasive and helpful, is not controlling. Polygraphs and urinalyses are distinct enough that this court believes the New York Court of Appeals would engage in fresh analysis to decide whether or not the common law of this state recognizes the action Santiago is attempting to pursue. This is where *Hall* truly proves its value to the instant inquiry: by providing the model for answering the question.

Of course the specific question before the court is whether Dr. Belmonte owed a legal duty to plaintiff in this matter. Issues concerning what dutiful obligations are owed to whom are commonly resolved by reference to relevant policy considerations. *Palka v. Servicemaster Mgt. Servs.,* 83 N.Y.2d 579, 585,

---

**2.** One last case from the Southern District of New York involving tort claims over allegedly negligent drug testing is too different to be help-

ful: In *Milam v. Herrlin* the employer was also the tester of the urine sample. 819 F.Supp. 295 (S.D.N.Y.1993).

611 N.Y.S.2d 817, 820, 634 N.E.2d 189, 192 (N.Y.1994). As we have seen, the *Hall* court first examined social considerations recommending that judicial relief be available to redress the consequences of negligent polygraph exams, and found them strong. Counterbalanced against those interests though were state and federal statutes aimed at controlling abusive polygraph testing. This ·is the schedule this court will use.

We begin by observing, as the *Hall* court did in relation to polygraphs, that drug screening has become commonplace in employment environments. Testing is performed

> in 98% of all Fortune 200 companies. In a recent ... survey of 1,151 employers, 77.7% of the employers acknowledged that they do some sort of drug testing. The surveyed companies reported testing 221,-000 employees and 523,000 prospective employees in 1994.
>
> David W. Lockard, Protecting Medical Laboratories from Tort Liability for Drug Testing, 17 J.Legal Med. 427, 427 (1996) (footnote omitted).

Partly due to governmental initiatives and partly to the perceived loss of productivity in American workers as a consequence of substance abuse, large companies drastically increased testing in the 1980s. *Id.* at 429–30. Indeed, drug testing itself has become big business: commercial laboratories earned a third of a billion dollars in testing revenue as early as 1990. Mark A. Rothstein, Workplace Drug Testing: A Case Study In The Misapplication of Technology, 5 Harv.J.L. & Tech. 65, 81 (1991).

"Reasons have been advanced for curtailment or regulation of these tests," the *Hall* court offered, in relation to polygraphs. 76 N.Y.2d at 33, 556 N.Y.S.2d at 25, 555 N.E.2d at 277. The same is true for drug screening. Even though the National Institute on Drug Abuse (NIDA), an agency of the Department of Health and Human Services, has promulgated guidelines for drug testing since 1987, federal law does not generally require that laboratories and collection points utilized by private employers adhere to them. Shane J. Osowski, Comment, Urinalysis Drug Testing of Employees at Will: The Need For Mandatory Standards, 11 N.Ill.U.L.Rev. 319, 332 (1991). Those NIDA guidelines, incidentally, prescribe strict chain of custody rules. *Id.* at 329–30. It was reported that as of 1996 only 90 out of approximately 1,200 drug testing facilities in the United States adhered to NIDA standards. Lockard, 17 J.Legal Med. at 431.[3]

Although the court presumes drug testing is significantly more accurate, if done correctly, than polygraph testing, the former procedure may also suffer from a false aura of infallibility.[4] One statistical study found that "two out of every five workers testing positive truly are drug free." Donald T. Barnum & John M. Gleason, The Credibility of Drug Tests: A Multi–Stage Bayesian Analysis, 47 Indus. & Lab.Rel.Rev. 610, 616 (1994).[5] Drug screens are plagued by the problems of "cross-reactivity"—namely, the familiar concern that metabolites of benign consumables, like poppy seed muffins, will be confused with metabolites of illicit substances; "impairment detectability," which refers to the fact that the time of ingestion of

---

**3.** It is true that drug testing for bus drivers like Santiago is regulated by the Omnibus Transportation Employee Testing Act of 1991, Pub.L. 102–143, Title V, 105 Stat. 952 (codified as amended in scattered sections of 45 & 49 U.S.C.), and 49 U.S.C. § 31306(c) in particular. But while NIDA standards now offer some protection to transportation employees, many other kinds of workers do not have that extra assurance. Additionally, as we shall see below, the Testing Act does not provide workers aggrieved by negligent testing any judicial remedy, unlike the aforementioned Polygraph Act.

**4.** *See* Osowski, 11 N.Ill.U.L.Rev. at 339–40 ("[B]oth drug and polygraph tests use scientific but inexact technology and may intrude upon employees' off-work privacy.").

**5.** The researchers then went on to offer this opinion on the reliability of positive test results:

> With probabilities such as these, a positive drug test would not provide credible evidence that an individual had taken drugs. Not only should employers lose arbitration or court cases with such meager evidence, but also it seems illogical, from the standpoint of good personnel practice, to dismiss or discipline employees using evidence with so little credibility. *Id.*

drugs cannot be determined from normal tests, and the level of judgment and motor impairment cannot be measured; "passive inhalation,"—breathing sidestream smoke of marihuana, for instance, may yield a false positive result; specimen dilution, substitution, or adulteration; improper calibration or cleaning of testing equipment; and simple technician error. Rothstein, 5 Harv.J.L. & Tech. at 74–76. Despite these problems, the generally held belief in the accuracy of drug tests "may lead employers to repose undue confidence in their results." *Hall*, 76 N.Y.2d at 34, 556 N.Y.S.2d at 25, 555 N.E.2d at 277.

The harm to employees falsely accused is significant:

> The risk of harm can be devastating. An employee can be shut out of the job market as a result of a tainted or negligent test result or report. The stigma as a drug user can cast doubt on the future prospects of employment, even if the test is later discovered to be a false positive. In a company that is downsizing, a mark or suspicion of any kind may result in an employee's termination and long-term unemployment.

Lockard, 17 J.Legal Med. at 428.

Against these harms, we of course recognize that employee "drug abuse contributes to increased absenteeism, decreased productivity, and in many cases an increased risk of workplace injury." Kevin G. Chapman, Drug Testing of Employees and Applicants: Legal and Practical Considerations for Private Employers in New York, N.Y.St.B.J., Feb. 1994, at 14. The court is not suggesting we toss the baby out with the bathwater, but merely that there are significant social considerations that recommend the availability of judicial relief for negligent administration of drug tests.

The *Hall* court reached similar conclusions in regards to polygraph tests. However they balanced those considerations against a number of laws aimed at curbing abusive polygraph use. When we perform that balancing with drug testing, the court finds very little

resting in the opposite pan of the scale. As one author put it:

> In New York, that balance has favored the detection of drug users through reasonable testing of employees and job applicants, and the developing law has generally affirmed the rights of a private employer to refuse to hire an applicant or to fire an employee who tests positive for illegal drug use.

*Id.*

There are no New York statutes specifically regulating drug testing, as there are in some states, *e.g.*, La.Rev.Stat.Ann. §§ 49:1001–1015 (West 1996). Dr. Belmonte observes that drug testers now fall within the ambit of Public Health Law § 571, and are consequently subject to the penalties of § 578. While that portion of the law requires clinical laboratories and blood banks to obtain certification from the state Department of Health, no procedures for drug testing are contained therein, and defendant has not drawn the court's attention to any pertinent regulations.[6] Moreover, it is not even clear Dr. Belmonte's office is covered by these statutes. *See* N.Y.Pub.Health Law § 579(1) (McKinney Supp.1997) (excluding "a licensed physician ... who performs laboratory tests or procedures, personally or through his or her employees, solely as an adjunct to the treatment of his or her own patients").

A recovering drug addict or former user may have some relief in the form of actions under the New York Human Rights Law or the Americans with Disabilities Act, Chapman, N.Y.St.B.J., Feb. 1994, at 15 & 17, but those statutes will not assist a plaintiff in Santiago's position. Nor will New York entertain suits asserting that employer-mandated drug screens violate state or federal constitutional rights concerning searches and seizures, or privacy. *E.g.*, *Claim of Atkinson*, 185 A.D.2d 415, 586 N.Y.S.2d 319 (N.Y.App.Div.1992). Thus, suits based on theories other than negligence do not appear promising.

What of federal statutes? The primary legislation promulgated by Congress in this

---

**6.** There are mandatory procedures for the testing of public gas utility employees. N.Y.Comp.Codes R. & Regs. tit. 16 § 262.

area is the Drug–Free Workplace Act of 1988, Pub.L. No. 100–690, Tit. V, Subpart D, 102 Stat. 4304 (codified as amended at 41 U.S.C. §§ 701–702). There is no comparison between the Employee Polygraph Protection Act, found significant by the Court of Appeals in *Hall,* and the Drug–Free Workplace Act. The Polygraph Act *forbids* all private employers from using polygraphs in most circumstances. The Drug–Free Workplace Act *requires* federal contractors and grant recipients to discourage and punish drug use amongst employees. Although the Act does not mandate drug screening, *e.g., Parker v. Atlanta Gas Light Co.,* 818 F.Supp. 345, 347 (S.D.Ga.1993), it is fair to say it encourages it, *e.g., Mares v. Conagra Poultry Co., Inc.,* 773 F.Supp. 248, 254–55 (D.Colo.1991), *aff'd,* 971 F.2d 492 (10th Cir.1992). Certainly it creates no express private cause of action for persons aggrieved by improper or negligent testing, as the Polygraph Act does. As for government sanctions, while the Polygraph Act authorizes the Secretary of Labor to seek civil penalties or injunctions against employers abusing polygraphs, the Drug–Free Workplace Act provides no similar remedies against employers abusing urinalyses or other drug tests.

Dr. Belmonte points to the Omnibus Transportation Employee Testing Act of 1991, Pub.L. 102–143, Title V, 105 Stat. 952 (codified as amended in scattered sections of 45 & 49 U.S.C.), as support for the conclusion that no judicial remedy for plaintiffs in Santiago's position should be recognized. Once again, though, the Testing Act does not provide the substantive protections for employees injured by improper testing that the Polygraph Act does. There is no express provision for an employee civil action in the former. The only sanctions mentioned are those that can be taken against transportation workers testing positive. 49 U.S.C. § 31306(f). Defendant compares apples and oranges in drawing analogies between the

Polygraph Act and the Drug–Free Workplace and Transportation Worker Testing Acts. This court is constrained to agree with the three dissenting Texas Supreme Court justices in *SmithKline* who made the following observations concerning the majority's citation of *Hall* as support for their decision to disallow claims like Santiago's:

> *Hall's* rationale would require that this court recognize the existence of a duty. The New York State Court of Appeals reasoned that the state legislature had provided statutory remedies for abuse by polygraph examiners ... and that the Federal Employee Polygraph Act of 1988 ... prohibited employer use of polygraphs except under limited circumstances and gave adequate statutory protection.... Essentially, the court concluded that the legislatures, state and federal, had occupied the field and that it should decline to recognize common law actions which might conflict with statutory schemes. Polygraph testing statutes are not drug testing statutes. No one suggests that there are such statutes as to drug testing in Texas, nor have we found any such comprehensive federal statutes. The reasoning of *Hall* simply does not apply. To the contrary, the implication from *Hall* is that New York would recognize a duty for drug testing companies under the summary judgment facts presented here.

903 S.W.2d at 359–60 (citation omitted).

This court concurs that the New York Court of Appeals, undertaking an analysis tracking *Hall's,* would recognize a common law cause of action in the matter sub judice.[7]

For the sake of completeness, and acknowledging the inherent uncertainty of *Erie* predictions, this court will also visit an aspect of the duty question the *Hall* court did not reach: the foreseeability of the plaintiff. *See Palsgraf,* 248 N.Y. at 344, 162 N.E. at 100. This court says simply that for a physician's

---

7. Without flushing out this issue, the court wishes to note one other possibly significant distinction between the instant case and *Hall:* here, instead of a detective agency performing the exam, we have a physician's office thus begging the question whether a doctor-patient relationship is created in these circumstances. *See Green v. Walker,* 910 F.2d 291, 296 (5th Cir.1990) ("We ... hold that when an individual is required, as a condition of future or continued employment, to submit to a medical examination, that examination creates a relationship between the examining physician and the examinee, at least to the extent of the tests conducted.").

office engaged in the business of collecting urine specimens from transportation workers for the purpose of drug screens, it is reasonably foreseeable that negligence contributing to a false positive could injure an employee. *Accord Stinson*, 646 N.E.2d at 933–34; *Lewis*, 588 So.2d at 170. Certainly, Dr. Belmonte must have been aware that Greyhound would not look kindly upon one of their bus drivers using cocaine.

■ Having determined Dr. Belmonte had a duty to Santiago to collect his specimen with due care, it is relatively simple to conclude that sufficient material factual issues exist that a trial is warranted. There is disagreement concerning how many specimen cups were at the collection counter in Dr. Belmonte's office after Santiago left the bathroom. There is a dispute as to whether Santiago initialed his cup. It appears uncontroverted that Dr. Belmonte's employee falsified Santiago's signature on the chain of custody form, then witnessed it with his own. If plaintiff proves his allegations, a reasonable factfinder could determine that defendant acted negligently. Consider:

> The proper collection of the urine sample is essential for a reliable drug test. The person to be tested must provide identification, wash his hands prior to voiding, and deliver a required volume of urine within an agreed-upon temperature range. A chain-of-custody form must be initiated for each sample, and all individuals who touch the sample during the course of testing must sign this form. The person who voided the urine then releases the sample to the person responsible for collection. In the presence of the person who provided the urine sample, the collector signs the chain-of-custody form as he receives the sample and places a chain-of-custody tape over the top of the sealed and properly labeled bottle. The person who provided the sample then initials the label on the container and verifies that the sample with the identification number is actually the sample that he delivered.

> Carlton E. Turner, Essay On Mechanics of Drug Testing, 33 Wm. & Mary L.Rev. 147, 147 (1991).

The court does not suggest the preceding paragraph describes the absolute standard of due care in such a case as this—that issue is for the jury. The court merely observes that plaintiff's version of the facts contain enough questionable procedures on the part of Dr. Belmonte's office that defendant's motion for summary judgment in this matter must be denied. *See also O'Connor v. SmithKline Bio–Science Labs., Inc.*, 36 Mass.App.Ct. 360, 631 N.E.2d 1018, 1020 (Mass.App.Ct.) (failure of lab employees handling specimen to sign chain of custody form was sufficient evidence to withstand summary judgment; but motion granted on causation issue), *review denied*, 418 Mass. 1106, 639 N.E.2d 1082 (Mass.1994) (reversing lower court's summary judgment order in favor of defendant laboratory in case involving chain of custody dispute).

■ In addition to his garden-variety negligence theory, plaintiff has asserted a claim of negligent representation. Defendant responds that the tort of negligent misrepresentation requires that the plaintiff himself, and not his employer, rely on the representations of Dr. Belmonte. In response, plaintiff has cited a number of cases, such as *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 493 N.Y.S.2d 435, 483 N.E.2d 110 (N.Y.1985), wherein plaintiffs were permitted to recover for injuries caused a defendant's misrepresentation to a third party. Dr. Belmonte replies by noting that the *Hall* court found this stable of precedents "of limited analytical utility in resolving a case such as this." 76 N.Y.2d at 32, 556 N.Y.S.2d at 24, 555 N.E.2d at 276. That conclusion is not surprising, considering the Court of Appeals held that the polygraph examiner owed no duty to the plaintiff in that case. Since the *Credit Alliance*-type cases turn on "the existence of a relationship between the parties sufficiently approaching privity," 65 N.Y.2d at 553, 493 N.Y.S.2d at 444, 483 N.E.2d at 119, the determination that no tort duty flowed from polygraph examiner to examinee likely encompassed a finding that the quasi-privity required for third-party negligent misrepresentation was also lacking. As this court has found a duty in the instant matter, there appears to be little reason not to allow plaintiff to proceed on this theory. Indeed,

this court is hard-pressed to see the practical distinction between the two negligence causes asserted against Dr. Belmonte.

The court denies Dr. Belmonte's motions.

## B. LSI

■ In light of the preceding analysis, if plaintiff had alleged any facts tending to show that LSI was negligent in actually testing the sample forwarded from Dr. Belmonte's, this court would allow Santiago to proceed to trial, as would most Louisiana courts. *But see Herbert,* 564 So.2d 371. That however is not the case. There is neither allegation nor indication that the results of LSI's urinalysis are faulty. Rather, Santiago alleges that LSI was negligent in not providing Dr. Belmonte a procedural guide on how to collect urine samples, thus contributing to the supposedly fouled chain of custody. No authorities have been submitted by plaintiff or located by the court that would support such a profound extension of the elementary duty to test the sample according to the applicable standards of due care. It must be remembered that Dr. Belmonte was a physician engaged primarily in occupational health, and routinely performed physicals and took urine specimens for transportation workers. Was it the testing laboratory's duty, in 1988, to instruct the physician on how to collect urine competently?

Some of the cases declining to hold drug testers liable to discharged employees in fact involved theories based on the laboratory's failure to execute some action collateral to the actual testing of the sample. In the *Caputo* case for example there was no dispute that the results of the screen were accurate—plaintiff only contended that the defendant laboratory should have explained the results better, notwithstanding the fact they were being transmitted to a physician and nurse working for plaintiff's employer. 1994 WL 100084, at *1–2. While acknowledging legitimate concerns about "misuses or abuses of drug test results," Senior Judge Troutman of the Eastern District of Pennsylvania found no justification for

> imposing additional and unprecedented duties upon a laboratory with the sole

function of analyzing a sample and returning a report, particularly when such report is factually accurate.

*Id.* at *3.

The Texas Supreme Court's *SmithKline* case similarly involved a proffered duty collateral to the simple duty of reasonable care in analyzing the specimen:

> Whether a laboratory is responsible to persons tested for negligently performing drug tests is not the issue before us. Doe does not complain that SmithKline failed to perform her drug test with reasonable care; she concedes that the test accurately identified opiates in her urine. Doe's complaint ... is that SmithKline did not warn her and Quaker of the effects of eating poppy seeds on drug tests. No court has imposed a duty on drug testing laboratories to warn test subjects about the possible influences on results.

903 S.W.2d at 351–52.

In fact the *SmithKline* court expressly declined to hold that drug testers do not owe the duty of reasonable care in analyzing urine samples, *id.* at 355, although the United States Court of Appeals for the Fifth Circuit subsequently interpreted Texas law in such a manner, *Willis,* 61 F.3d at 316.

■ Plaintiff suggests that irregularities with the chain-of-custody form should have heightened LSI's awareness, made them question the procedures undertaken by Dr. Belmonte, and reject the specimen. Santiago maintains LSI's failure to do so was negligent. Assuming arguendo that LSI owes Santiago the described duty, the facts are insufficient as a matter of law to support the claim. Plaintiff argues that the notation on the chain-of-custody form in the comments space—"none"—should have alerted LSI. *See* Ex. 12 att'd to Santiago Affs., Doc. 45. That note comes under a heading which reads "Doctor's Office Comments: (list all drugs, medications donor is presently taking, urine temp, color, general condition of sample, etc.)". The more obvious interpretation for LSI to take is that Dr. Belmonte or his employees had no comments. That is, the specimen donor was taking no medication,

and the sample was not unusual in color, temperature, or other characteristic.

Plaintiff also points out that the chain-of-custody form as received from Dr. Belmonte's did not indicate what class of Greyhound employee Santiago was, and that this omission should have prompted rejection of the sample. However, deposition testimony from an LSI employee indicates that Greyhound was probably telephoned, and the plaintiff's classification as a driver learned. Pizzo Dep.Tr., Ex. D att'd to LSI Mot., Doc. 29, at 112–115. In any event, these omissions are innocuous, and LSI's failure to prognosticate from them the irregularities with the urine collection back at Dr. Belmonte's Albany office is far too tenuous evidence of negligence to justify sending the issue to the jury.

Lastly, plaintiff argues that LSI's failure to detect Anthony Chouffi's forgery of the plaintiff's name was negligent. The court does not understand how the laboratory could have discovered the forgery, unless it possessed an exemplar of Santiago's actual signature and was duty-bound to compare it to the chain of custody form. Perhaps a handwriting expert could have determined that the employee and witness signatures were affixed by the same individual; but the suggestion that LSI was obligated to employ such a person for the purpose of checking signatures seems specious. An alternative reading of plaintiff's claim in this regard is that it is another variant of the argument that LSI was required to provide procedural manuals to Dr. Belmonte (presumably manuals that instruct specimen collectors not to forge donor's names on chain of custody forms). The court has already dismissed that suggestion as extreme and unsupportable.

Under either New York's formula, which defines duty with reference to the foreseeability of the plaintiff and numerous policy factors, *e.g., Burke v. Warren County Sheriff's Dep't*, 916 F.Supp. 181, 185 (N.D.N.Y. 1996), or under Louisiana's duty-risk analy-

sis, *see Mart v. Hill*, 505 So.2d 1120, 1122 (La.1987), there is no basis in precedent or policy for imposing a new duty on LSI. The motion of Laboratory Specialists, Incorporated for summary judgment upon count eight of the amended complaint is granted.

## C. Greyhound

We start with two concessions made at the oral argument upon these cross-motions. First, the plaintiff failed to file a complaint with the Equal Employment Opportunity Commission within 300 days of his discharge, thus precluding his claim under Title VII. *See, e.g., Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).[8] And second, plaintiff's two negligence/wrongful discharge theories are preempted by his claim under § 301 of the Taft–Hartley Act. *See Gregory v. Northern R.R. Co.*, 638 F.Supp. 538, 543 (D.Minn.1985), *aff'd*, 822 F.2d 1092 (8th Cir.1987). As defendant Greyhound's motion for summary judgment upon these claims is unopposed and indisputable, counts four, five, and the federal law aspects of counts one and three are dismissed. Still remaining are plaintiff's causes for breach of employment contract and his discrimination theories under the Executive Law of New York state.

■ Examining the latter theories, the court observes that discrimination claims under the New York Human Rights Law are governed by the familiar *McDonnell Douglas* burden-shifting approach. *E.g., Sogg v. American Airlines, Inc.*, 193 A.D.2d 153, 155–54, 603 N.Y.S.2d 21, 23 (N.Y.App.Div. 1993), *appeal dismissed*, 83 N.Y.2d 846, 612 N.Y.S.2d 106, 634 N.E.2d 602 (N.Y.1994). For the purposes of Greyhound's motion, the court will take the evidence in the light most favorable to plaintiff, *e.g., Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and assume a prima facie case has been made out (although Greyhound disputes this). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

---

**8.** Plaintiff does not argue, nor does it appear, that any grounds exist for tolling the limitations period, or equitably estopping Greyhound from asserting it. *Cf. Dillman v. Combustion Eng'g,* *Inc.*, 784 F.2d 57, 59 (2d Cir.1986) (describing application of equitable tolling and estoppel to Age Discrimination in Employment Act case).

36 L.Ed.2d 668 (1973). The court however finds that Greyhound has come forward with "rebuttal evidence articulating a legitimate, independent, nondiscriminatory reason for its actions." *Sogg*, 193 A.D.2d at 156, 603 N.Y.S.2d at 23. *See also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Specifically, Greyhound has rebutted the inference of discrimination with evidence tending to show Santiago was dismissed for using illegal drugs. Greyhound, after all, had received urinalysis results, the accuracy of which is not contested, which revealed that the specimen attributed to plaintiff tested positive for cocaine metabolites. It hardly needs be said that drug usage by a bus driver is contrary to the safe operation of a common carrier, and would be a legitimate reason for discharge. Indeed, plaintiff admitted that it was "common knowledge" at his workplace that a positive drug screen would result in termination. Santiago Dep. Tr., Ex. A att'd to Doc. 29, at 43.

It then falls to plaintiff to establish that the employer's proffered legitimate reason was merely pretextual, and that invidious discrimination motivated the termination. *E.g., Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. In the first instance, Santiago contends that his supervisor at Greyhound could not have reasonably relied on the accuracy of the urinalysis because he knew or should have known that the forgery on the chain-of-custody form rendered the test results suspect. Santiago informed supervisor Hoffman of the apparent forgery at the interview they had on October 4, 1988, the day the positive test results were received. Although a second test was ordered, plaintiff was discharged before the negative results of that screen were returned. According to his deposition, Hoffman did not learn from Dr. Belmonte's office that the signature actually was forged until months after the discharge. Hoffman Dep.Tr., Ex. att'd to Doc. 36, at 29. That testimony is somewhat contradicted by Dr. Belmonte's deposition which indicates that Hoffman and he both heard Anthony Chouffi's confession to the forgery in November of 1988, only a month after the firing. Belmonte Dep.Tr., Ex. B att'd to Doc. 29, at 116. But in either event it does not appear that Hoffman was aware of any evidence, other than plaintiff's protestations, that the signature on the chain-of-custody form was not his own before the discharge. *Cf. O'Keefe v. Niagara Mohawk Power Corp.*, 714 F.Supp. 622, 627 (N.D.N.Y.1989) (McCurn, C.J.) (employer did not become aware of plaintiff's alcoholism until after termination; defendant granted summary judgment on New York Human Rights Law claim). Santiago's assertions that the urine was not his own, the signature someone else's, hardly seems sufficient in the circumstances of this case to demonstrate that Greyhound's proffered reason for termination was a sham.

But assuming arguendo that this is some evidence of pretext, plaintiff has still not succeeded in showing that race, ethnic, or national origin discrimination was the actual reason for his dismissal. It must be remembered that plaintiff's burden after the prima facie case has been rebutted by legitimate reasons is two pronged:

> In an employment discrimination case, to defeat a defendant's properly supported motion for summary judgment, a plaintiff must show that there is a material issue of fact as to whether (1) the employer's asserted reason for discharge is false or unworthy of belief *and* (2) more likely than not the employee's [race/ethnicity/national origin] was the real reason for the discharge.

*Woroski v. Nashua Corp.*, 31 F.3d 105, 108–09 (2d Cir.1994) (ADEA case).

There is virtually no evidence that the termination was because of impermissible factors. The evidence is so paltry that we review it in toto below.

That evidence consists almost exclusively of this brief passage in Santiago's deposition:

Q. Okay. What I would like to know is the basis for your belief that the actions taken against you by Greyhound were caused because you're hispanic?

A. Well, there is three I can think of off the top. I was the only one on the Greyhound extra board who was hispanic or, by the way, just minority period, at that time. Number two,

there was remarks made indirectly in my presence of, "There goes the neighborhood, We got a Puerto Rican in the block." That was made not only by drivers, but employees in the terminal itself, and at one time or another Mr. Hoffman made something to the effect—very uncomfortable feeling.

Q. Anything else?

A. No.

Santiago Dep.Tr., Ex. A att'd to Doc. 29, at 85–86.

Plaintiff characterized the amount of times he heard such comments as "numerous." However, he heard them "indirectly," an adverb not elaborated upon in the deposition. *Id.* at 86–87. He never complained to management or the union. Significantly, when asked whether he believed the drug screen he was sent to take was because of his race, plaintiff said "No. It's an annual thing." *Id.* at 88 (actually, the testing seems to be performed every other year). Santiago also deposed that Hoffman made no references to his national origin after confronting him with the positive screen results. *Id.* at 88.

Plaintiff did not link any specific incident to any specific person. Most importantly, he was unable to show how any race, ethnic, or national origin discrimination was connected to the adverse employment decision. To the contrary, plaintiff deposed that the test itself was administered in a nondiscriminatory fashion to all drivers, and that his supervisor made no remarks at his termination meeting suggesting that invidious discrimination was the reason for his discharge. Such vague, sparse allegations cannot survive Greyhound's motion for summary judgment upon the state law claims in counts one and three of the amended complaint.

█ Finally with respect to Greyhound's motion, the court turns to plaintiff's breach of contract claim, which is properly characterized as a suit under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, also known as the Taft–Hartley Act. Santiago argues that Greyhound breached that part of the collective bargaining agreement then in effect between Greyhound and

plaintiff's union which provided that "[a]n employee will not be disciplined or discharged ... without sufficient cause." CBA, Ex. 5 att'd to Doc. 36, § 27(k), at 12. In response Greyhound argues that plaintiff failed to exhaust his administrative remedies, and failed to show that the union was deficient in their representation of plaintiff.

Although it is true a plaintiff asserting a breach of CBA theory under the Taft–Hartley Act must ordinarily exhaust internal grievance procedures before resorting to the court, *e.g., Vaca v. Sipes,* 386 U.S. 171, 184 (1967), plaintiff has correctly observed that the CBA at issue leaves grievance proceedings above a certain level to the discretion of the union. The Supreme Court has said the employee-plaintiff can bring suit against the employer when

the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* ... the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance.

*Id.* at 185 (italics in original).

Of course, plaintiff has never suggested the union wrongfully refused to pursue plaintiff's grievance to arbitration. In fact, when Santiago was asked at his deposition why he declined the offer of reinstatement plus 75% of backpay apparently secured through the grievance procedure, he declined to answer. Santiago Dep.Tr., Ex. A att'd to Doc. 29, at 81–82.

The Second Circuit has described the plaintiff's burden in such a situation in strident terms: the union's conduct must be shown to be arbitrary, discriminatory, or in bad faith, and the misconduct must have seriously undermined the arbitral process. *Barr v. United Parcel Serv.,* 868 F.2d 36, 43 (2d Cir.1989) (citations omitted). There is no evidence whatsoever that the union breached its duty of fair representation to Santiago. To the contrary, Greyhound's ultimate offer of reinstatement plus backpay reflects considerable diligence and success on the part of the union. Summary judgment upon plaintiff's claim pursuant to § 301 of the Labor

Management Relations Act, count two of the amended complaint, is appropriate.

To conclude this section of the opinion, the court grants Greyhound Lines' motion for summary judgment against the plaintiff in its entirety.

### D. Contribution

At this stage, only Dr. Belmonte remains as a defendant. He has asserted cross-claims for indemnification and apportionment against LSI and Greyhound in the event he should be found liable to plaintiff. LSI has moved for summary judgment dismissing the cross-claim. Since no facts indicate any dereliction in LSI's duty to professionally test the specimen, and no other basis for holding the laboratory at fault for Dr. Belmonte's possible negligence has been suggested, LSI's motion is granted and Dr. Belmonte's claim for indemnification and apportionment against LSI is dismissed.

Dr. Belmonte has made a similar claim against Greyhound. Although Greyhound has not explicitly asked for summary judgment upon Dr. Belmonte's cross-claim, the court perceives no rationale for holding Greyhound liable for the potential negligence of Dr. Belmonte. This claim is also dismissed.

All other contribution, indemnification, and apportionment claims are necessarily decided by the summary judgment decisions already made.

### III. CONCLUSION

The motion of defendant Dr. Dominic J. Belmonte, doing business as Albany Industrial Physicians, for summary judgment pursuant to Fed.R.Civ.P. 56 upon the seventh and eighth causes of action in plaintiff's amended complaint is DENIED.

The motion of defendant Laboratory Specialists, Inc. for summary judgment upon the plaintiff's sixth cause of action is GRANTED.

The motion of defendant Greyhound Lines, Inc. for summary judgment upon the plaintiff's first, second, third, fourth, and fifth causes of action is GRANTED.

All claims for indemnification, contribution, and apportionment are DENIED and DISMISSED.

Although no federal question remains for trial, and the plaintiff and remaining defendant are nondiverse, the court declines to remand the case to the New York State Supreme Court, County of Montgomery, from which it was removed in July of 1989. The interests of justice would not be served by remand, given the length of time this action has been pending and this court's familiarity with the case. *See, e.g., Falls Riverway Realty v. City of Niagara Falls*, 732 F.2d 38, 43 (2d Cir.1984) (district court has discretion to either remand or retain a properly removed case when all federal law claims have been eliminated and only pendent state law claims remain); *accord Whalen v. County of Fulton*, 941 F.Supp. 290, 298 (N.D.N.Y.1996) (Scullin, J.).

Plaintiff Santiago and defendant Belmonte are directed to prepare for trial commencing at ten o'clock in the morning on February 25, 1997 at the United States Courthouse in Albany, New York.

It is So Ordered.