[934 NYS2d 183]

Eric Landon, Appellant, v Kroll Laboratory Specialists, Inc., Respondent.

Second Department, November 22, 2011

[REDACTED]

### APPEARANCES OF COUNSEL

*Robert N. Isseks*, Middletown, and *Bloom & Bloom, P.C.*, New Windsor (*Kevin Bloom* of counsel), for appellant.

*Anderson & Ochs, LLP*, New York City (*Mitchel H. Ochs* of counsel), for respondent.

### OPINION OF THE COURT

MILLER, J.

In this case we are called upon to determine whether a drug testing laboratory may be held liable in tort to the subject of a drug test for negligently testing that subject's biological specimen notwithstanding the absence of a formal contractual relationship between the drug testing laboratory and the subject of the drug test. We answer the question in the affirmative.

The complaint in this action alleged that the defendant, Kroll Laboratory Specialists, Inc., was a Louisiana corporation which held a New York State Department of Health Laboratory Permit for Comprehensive Forensic Toxicology and which was in the business of performing forensic toxicology testing to determine the presence or absence of illicit or controlled substances. The defendant entered into a contract with the Orange County Probation Department to analyze oral fluid samples provided by individuals on probation.

On January 28, 2002, the plaintiff was convicted of forgery in the second degree in Orange County. The County Court sentenced the plaintiff to a five-year term of probation. As a condition of his sentence, the plaintiff was required to submit to periodic and random drug testing at the direction of his probation officer.

The plaintiff alleged that on December 17, 2007, while still serving his probationary sentence, he was directed by his probation officer to submit an oral fluid sample for the purpose of determining whether he was complying with the terms of his probation. An oral sample was taken by the plaintiff 's probation officer utilizing a device known as "the Intercept DOA Oral Specimen Collection Device" which was manufactured by Orasure Technologies, Inc. (hereinafter Orasure), and which had been purchased from the defendant for such purposes. The

oral sample was sent to the defendant to determine whether it contained illicit or controlled substances.

Later that day on December 17, 2007, the plaintiff obtained an independent blood test, which revealed that the plaintiff's blood sample was negative for illicit or controlled substances on December 17, 2007.

The complaint stated that the oral sample provided by the plaintiff was received at the defendant's facility on December 20, 2007. Screening was performed in accordance with the defendant's standard policy and practice utilizing a "Micro-Plate EIA," a device also developed by Orasure. It was determined that the oral sample contained amounts of cannabinoids which exceeded the defendant's screen test cutoff level of 1.0 ng/mL.

In a written report dated December 20, 2007, the defendant informed the Orange County Probation Department that the oral sample tested positive for marijuana. The complaint alleged that as a result of this erroneous report, the plaintiff's probationary sentence was extended for months beyond the original term and he was compelled to make multiple court appearances to prevent his incarceration based on the erroneous test result.

The plaintiff claimed that the defendant utilized a screen test cutoff level of only 1.0 ng/mL despite the fact that Orasure, the manufacturer of the collection device and the developer of the testing method, recommended a screen test cutoff level of at least 3.0 ng/mL. Moreover, the complaint alleged that the industry-wide standard for forensic drug testing required a screen test cutoff level of 4.0 ng/mL.

In addition, the complaint alleged that the test performed by the defendant was never confirmed by use of a gas chromatography-mass spectrometry test (hereinafter a GC/MS test) or by any other method. The complaint further alleged that holders of a New York State Department of Health Laboratory Permit for Comprehensive Forensic Toxicology were required to utilize a GC/MS test before reporting a positive test result.

The defendant moved to dismiss the complaint asserting, among other things, that the plaintiff failed to state a cause of action. The Supreme Court granted that branch of the defendant's motion and dismissed the complaint pursuant to CPLR 3211 (a) (7). We reverse the order insofar as appealed from.

"A party may move for judgment dismissing one or more causes of action asserted against [it] on the ground that . . . the

pleading fails to state a cause of action" (CPLR 3211 [a] [7]). "When assessing the adequacy of a complaint in light of a CPLR 3211 (a) (7) motion to dismiss, the court must afford the pleadings a liberal construction, accept the allegations of the complaint as true and provide plaintiff . . . 'the benefit of every possible favorable inference' " (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 591 [2005], quoting *Leon v Martinez*, 84 NY2d 83, 87 [1994]).

"Whether a plaintiff can ultimately establish its allegations is not part of the calculus in determining a motion to dismiss" (*EBC I, Inc. v Goldman, Sachs & Co.*, 5 NY3d 11, 19 [2005]). Rather, a court must "determine only whether the facts as alleged fit within any cognizable legal theory" (*Leon v Martinez*, 84 NY2d at 87-88; *see Sokoloff v Harriman Estates Dev. Corp.*, 96 NY2d 409, 414 [2001]).

The Court of Appeals has recognized that "the line separating tort and contract claims may be elusive [and] the classification . . . consequential" (*Sommer v Federal Signal Corp.*, 79 NY2d 540, 551 [1992]; *see Preferred Mut. Ins. Co. v C. Rumbalski Chimney Sweep*, 46 AD3d 866, 867 [2007]). In order to gain perspective on this issue, we begin by considering the source of the respective duties imposed in tort law and contract law.

"Duty is essentially a legal term by which we express our conclusion that there can be liability" (*De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055 [1983]). Obligations that flow exclusively from a contract must be enforced as contractual duties under a theory of contract law (*see Church v Callanan Indus.*, 99 NY2d 104, 111 [2002]; *Stiver v Good & Fair Carting & Moving, Inc.*, 32 AD3d 1209, 1210 [2006], *affd* 9 NY3d 253 [2007]; *see also* Prosser and Keeton, Torts § 92, at 655-656 [5th ed]). Thus "where a party is merely seeking to enforce its bargain, a tort claim will not lie" (*New York Univ. v Continental Ins. Co.*, 87 NY2d 308, 316 [1995]; *see Board of Mgrs. of the Chelsea 19 Condominium v Chelsea 19 Assoc.*, 73 AD3d 581, 582 [2010]; *Megaris Furs v Gimbel Bros.*, 172 AD2d 209, 211 [1991]). Furthermore, a court enforcing a contractual obligation will ordinarily impose a contractual duty only on the promisor in favor of the promisee and any intended third-party beneficiaries (*see Eaves Brooks Costume Co. v Y.B.H. Realty Corp.*, 76 NY2d 220, 226 [1990]).

On the other hand, "[a] tort obligation is a duty imposed by law to avoid causing injury to others" (*New York Univ. v Continental Ins. Co.*, 87 NY2d at 316). Accordingly, "the liability

to make reparation for an injury rests not upon the consideration of any reciprocal obligation, but upon an original moral duty enjoined upon every person so to conduct himself [or herself], or exercise his [or her] own rights as not to injure another" (*Rich v New York Cent. & Hudson Riv. R.R. Co.*, 87 NY 382, 398 [1882]; *see New York Univ. v Continental Ins. Co.*, 87 NY2d at 316; *Havas v Victory Paper Stock Co.*, 49 NY2d 381, 386 [1980]; *see also Heaven v Pender,* 11 QBD 503, 509 [1883, Brett, M.R.]).

A person is not necessarily insulated from liability in tort merely because he or she is engaged in performing a contractual obligation (*see Rich v New York Cent. & Hudson Riv. R.R. Co.*, 87 NY at 398; *see also* Prosser and Keeton, Torts § 93, at 667 [5th ed]). "Thus, [a] defendant may be liable in tort when it has breached a duty of reasonable care distinct from its contractual obligations, or when it has engaged in tortious conduct separate and apart from its failure to fulfill its contractual obligations" (*New York Univ. v Continental Ins. Co.*, 87 NY2d at 316; *see North Shore Bottling Co. v Schmidt & Sons*, 22 NY2d 171, 179 [1968]; *Bandier v Tim Blenk Tree Care, Inc.*, 57 AD3d 595, 596 [2008]; *International Fid. Ins. Co. v Gaco W.*, 229 AD2d 471, 474 [1996]).

"The very nature of a contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim" (*New York Univ. v Continental Ins. Co.*, 87 NY2d at 316). Furthermore "[a] legal duty independent of contractual obligations may be imposed by law as an incident to the parties' relationship" (*Sommer v Federal Signal Corp.*, 79 NY2d at 551; *see Moch Co. v Rensselaer Water Co.*, 247 NY 160, 167 [1928]; *see also* Dobbs, Torts § 111, at 260 [2000]).

In this regard "[p]rofessionals, common carriers and bailees, for example, may be subject to tort liability for failure to exercise reasonable care, irrespective of their contractual duties" (*Sommer v Federal Signal Corp.*, 79 NY2d at 551; *see Glanzer v Shepard*, 233 NY 236, 239 [1922]; *Rich v New York Cent. & Hudson Riv. R.R. Co.*, 87 NY at 399). "In these instances, it is policy, not the parties' contract, that gives rise to a duty of due care" (*Sommer v Federal Signal Corp.*, 79 NY2d at 552; *see Bullmore v Ernst & Young Cayman Is.*, 45 AD3d 461, 463 [2007]).

Historically, "[o]ne of the earliest appearances of what we now know as negligence was in the liability of those who

professed to be competent in certain 'public' callings" (Prosser and Keeton, Torts § 28, at 161 [5th ed]). "A carrier, an innkeeper, a blacksmith, or a surgeon, was regarded as holding oneself out to the public as one in whom confidence might be reposed, and hence as assuming an obligation to give proper service, for the breach of which, by any negligent conduct, he might be liable" (*id.; see Milau Assoc. v North Ave. Dev. Corp.*, 42 NY2d 482, 486 [1977]; *see also* 1A NY PJI3d 2:15, at 241 [2007]; Arterburn, *The Origin and First Test of Public Callings*, 75 U Pa L Rev 411 [1927]; Winfield, *The History of Negligence in the Law of Torts*, 42 L Q Rev 184 [1926]; *cf. Chase Scientific Research v NIA Group*, 96 NY2d 20, 28-29 [2001]).

Similarly, the Restatement (Second) of Torts recognizes that "[a]n act may be negligent if it is done without the competence which a reasonable man in the position of the actor would recognize as necessary to prevent it from creating an unreasonable risk of harm to another" (Restatement [Second] of Torts § 299). Thus the degree of care that a reasonably prudent person would use under the circumstances may be established through evidence of the general customs and practices of others who are in the same business or trade as that of the alleged tortfeasor (*see Trimarco v Klein*, 56 NY2d 98, 105 [1982]; *see also* 1A NY PJI3d 2:15, at 241 [2007]; Prince, Richardson on Evidence §§ 4-603, 7-307 [Farrell 11th ed]). This traditional negligence standard of ordinary care is variously reflected in cases involving services provided by, among other workers, physicians (*see Pike v Honsinger*, 155 NY 201, 209-210 [1898]), psychiatrists (*see Bell v New York City Health & Hosps. Corp.*, 90 AD2d 270, 280-281 [1982]), psychologists (*see Karasek v LaJoie*, 92 NY2d 171, 176 [1998]), lawyers (*see McCoy v Feinman*, 99 NY2d 295, 301-302 [2002]), accountants (*see Ackerman v Price Waterhouse*, 84 NY2d 535, 541 [1994]), engineers (*see 470 Owners Corp. v Richard L. Heimer, P.E., P.C.*, 258 AD2d 558, 558 [1999]), architects (*see Richards v Passarelli*, 77 AD3d 905, 909 [2010]), social workers (*see Eckman v Cipolla*, 77 AD3d 704, 705 [2010]), barbers (*see Cornbrooks v Terminal Barber Shops, Inc.*, 282 NY 217, 222 [1940]), bean weighers (*see Glanzer v Shepard*, 233 NY at 241-242), elevator operators (*see Guaman v Industry City Mgt.*, 40 AD3d 698, 699 [2007]), druggists (*see Allan v State S.S. Co. [Ltd.]*, 132 NY 91, 95), and laboratory testing providers (*see Tambrands, Inc. v Lockwood Greene Engrs.*, 178 AD2d 406 [1991]).

The complaint in this case alleges that the defendant undertook to perform forensic toxicology testing and that the

defendant was negligent in the performance of this undertaking. The complaint alleges that the defendant did not use reasonable care under the circumstances, as evinced by the general customs and practices that others in the field of forensic toxicology testing would reasonably use in the same situation. Accordingly, there is little difficulty in reaching the conclusion that the complaint in this case adequately alleges that the defendant failed to exercise reasonable care under the circumstances (*see Tambrands, Inc. v Lockwood Greene Engrs.*, 178 AD2d 406 [1991]; *see also Weiner v Lenox Hill Hosp.*, 88 NY2d 784, 788 [1996]; *Playford v Phelps Mem. Hosp. Ctr.*, 254 AD2d 471, 471 [1998]).

However, as it is often said, " '[p]roof of negligence in the air, so to speak, will not do' " (*Palsgraf v Long Is. R.R. Co.*, 248 NY 339, 341 [1928], quoting Pollock, Torts, at 455 [11th ed]). "Without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm" (*Lauer v City of New York*, 95 NY2d 95, 100 [2000]; *see Hamilton v Beretta U.S.A. Corp.*, 96 NY2d 222, 232 [2001]).

"Unlike foreseeability and causation, which are issues generally and more suitably entrusted to fact finder adjudication, the definition of the existence and scope of an alleged tortfeasor's duty is usually a legal, policy-laden declaration reserved for Judges to make prior to submitting anything to fact-finding or jury consideration" (*Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d 579, 585 [1994]; *see Espinal v Melville Snow Contrs.*, 98 NY2d 136, 138 [2002]; *Lauer v City of New York*, 95 NY2d at 100).

"[D]uty is not something derived or discerned from an algebraic formula" (*Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d at 585). "Rather, it coalesces from vectored forces including logic, science, weighty competing socioeconomic policies and sometimes contractual assumptions of responsibility" (*id.*; *see Hall v United Parcel Serv. of Am.*, 76 NY2d 27, 32 [1990]; *De Angelis v Lutheran Med. Ctr.*, 58 NY2d at 1055).

"Duty in negligence cases is defined neither by foreseeability of injury . . . nor by privity of contract" (*Strauss v Belle Realty Co.*, 65 NY2d 399, 402 [1985]; *see Glanzer v Shepard*, 233 NY at 239). "But while the absence of privity does not foreclose recognition of a duty . . . [c]onsiderations of privity are not entirely irrelevant in implementing policy" (*Strauss v Belle Realty Co.*, 65 NY2d at 402-403; *see Bonwell v Stone*, 128 AD2d 1013, 1014 [1987]).

"Contractual privity as the basis for defining the ambit of duty in negligence cases derives from the famous case of *Winterbottom v Wright* (10 M & W 109, 152 Eng Rep 402 [Ex 1842]), a suit by an injured coachman against the supplier of a coach whose defective wheel had caused him injury" (*Ossining Union Free School Dist. v Anderson LaRocca Anderson,* 73 NY2d 417, 421-422 [1989]; *see Credit Alliance Corp. v Arthur Andersen & Co.,* 65 NY2d 536, 546-547 [1985]).

In *Winterbottom,* recovery in tort was denied on the ground that there was no privity of contract between the injured coachman and the supplier of the defective wheel (*see Winterbottom v Wright,* 10 M & W at 114, 152 Eng Rep at 405 [Ex 1842]).

The courts of this state have long eschewed strict application of the privity requirement espoused in *Winterbottom* in actions involving physical injury (*see MacPherson v Buick Motor Co.,* 217 NY 382, 390 [1916]; *Statler v Ray Mfg. Co.,* 195 NY 478, 481-482 [1909]; *Fish v Waverly Elec. Light & Power Co.,* 189 NY 336, 345 [1907]; *Devlin v Smith,* 89 NY 470, 477-478 [1882]; *Thomas v Winchester,* 6 NY 397, 410-411 [1852]; *Kahner v Otis El. Co.,* 96 App Div 169, 174-175 [1904], *affd* 183 NY 512 [1905]; *Burke v Ireland,* 26 App Div 487, 491-492 [1898]; *see also Palka v Servicemaster Mgt. Servs. Corp.,* 83 NY2d at 589). Even where purely economic injuries have been alleged, the Court of Appeals has recognized the existence of tort duties in situations where the relationship between the parties was "so close as to approach that of privity" (*Ultramares Corp. v Touche,* 255 NY 170, 182-183 [1931]; *see Estate of Schneider v Finmann,* 15 NY3d 306, 309 [2010]; *Prudential Ins. Co. of Am. v Dewey, Ballantine, Bushby, Palmer & Wood,* 80 NY2d 377, 383-385 [1992]; *Ossining Union Free School Dist. v Anderson LaRocca Anderson,* 73 NY2d at 419; *European Am. Bank & Trust Co. v Strauhs & Kaye,* 65 NY2d 536, 554 [1985]; *White v Guarente,* 43 NY2d 356, 363 [1977]; *Glanzer v Shepard,* 233 NY at 239).

Whatever the nature of the injury however, the underlying rationale for inquiring into the issue of contractual privity in this context is a "deep concern about the widespread liability to which a [contractor] would be exposed without some circumscribing principle" (*Ossining Union Free School Dist. v Anderson LaRocca Anderson,* 73 NY2d at 422, citing Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment,* 37 Stan L Rev 1513, 1529 [1985]). "The common law of torts is, at its foundation, a means of apportioning risks and

allocating the burden of loss" and "we are . . . bound to consider the larger social consequences of our decisions and to tailor our notion of duty so that 'the legal consequences of wrongs [are limited] to a controllable degree' " (*Waters v New York City Hous. Auth.*, 69 NY2d 225, 229 [1987], quoting *Tobin v Grossman*, 24 NY2d 609, 619 [1969]; *see Eiseman v State of New York*, 70 NY2d 175, 187 [1987]). "In reaching the policy judgment called 'duty', courts have therefore invoked a concept of privity of contract as a means of fixing fair, manageable bounds of liability in such cases" (*Ossining Union Free School Dist. v Anderson LaRocca Anderson*, 73 NY2d at 421; *see Espinal v Melville Snow Contrs.*, 98 NY2d at 139).

Courts have utilized this concept of privity to "limit[ ] the universe of permissible plaintiffs because a failure to do so would impose a duty of reasonable care enforceable by any member of an indeterminate class of persons, present and prospective, known and unknown, directly or indirectly injured by any negligence" (*Eiseman v State of New York*, 70 NY2d at 188; *see Ultramares Corp. v Touche*, 255 NY at 189; *Moch Co. v Rensselaer Water Co.*, 247 NY at 168). These concerns are particularly acute when economic injuries are alleged since such injuries may reverberate ad infinitum from a single negligent act (*see* Rabin, *Tort Recovery for Negligently Inflicted Economic Loss: A Reassessment*, 37 Stan L Rev 1513 [1985]; *cf. 532 Madison Ave. Gourmet Foods v Finlandia Ctr.*, 96 NY2d 280 [2001]; *Hall v United Parcel Serv. of Am.*, 76 NY2d 27 [1990]; *Beck v FMC Corp.*, 53 AD2d 118 [1976], *affd* 42 NY2d 1027 [1977]). "In short . . . the 'specter of limitless liability' is banished only when 'the class of potential plaintiffs to whom the duty is owed is circumscribed by the relationship' " between the parties (*Matter of New York City Asbestos Litig.*, 5 NY3d 486, 498 [2005], quoting *Hamilton v Beretta U.S.A. Corp.*, 96 NY2d at 233; *see Stiver v Good & Fair Carting & Moving, Inc.*, 9 NY3d 253, 257 [2007]; *Eiseman v State of New York*, 70 NY2d at 188).

Here, the prospect of limitless liability is extremely small. The duty alleged in the complaint relates only to a narrow class of specific and readily identifiable individuals whose biological samples were accepted and tested for the defined contractual purpose (*cf. Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d at 589; *White v Guarente*, 43 NY2d at 363; *Glanzer v Shepard*, 233 NY at 239). The nexus between the defendant, as the testing party, and the plaintiff, as the subject of the test, was not remote or attenuated, and it existed at the time the alleged negligence occurred (*cf. Sykes v RFD Third Ave. 1 Assoc., LLC*,

15 NY3d 370, 372-373 [2010]; *Stiver v Good & Fair Carting & Moving, Inc.*, 9 NY3d at 257; *Espinal v Melville Snow Contrs.*, 98 NY2d at 141; *Hamilton v Beretta U.S.A. Corp.*, 96 NY2d at 233-234; *Eiseman v State of New York*, 70 NY2d at 188). Moreover, the alleged duty would not be owed to an untold number of people or otherwise result in a "crushing burden" of limitless liability (*Moch Co. v Rensselaer Water Co.*, 247 NY at 165; *cf. Matter of New York City Asbestos Litig.*, 5 NY3d at 498; *Church v Callanan Indus.*, 99 NY2d 104, 111 [2002]; *Espinal v Melville Snow Contrs.*, 98 NY2d at 141; *Milliken & Co. v Consolidated Edison Co. of N.Y.*, 84 NY2d 469, 477-478 [1994]; *Strauss v Belle Realty Co.*, 65 NY2d at 403).

The burden such liability would impose, whatever the magnitude, must nevertheless be weighed against the societal benefits resulting from the imposition of the alleged legal duty (*see Peralta v Henriquez*, 100 NY2d 139, 145 [2003]; *Waters v New York City Hous. Auth.*, 69 NY2d at 230). In order to evaluate the benefits of stemming negligent drug testing, we consider its role in today's society.

The importance attached to the results of drug tests can hardly be overstated. Indeed, the results of drug tests may form the basis for decisions affecting the very core of people's lives. A positive test may result in the loss of current employment (*see e.g. Matter of Kirk v City of New York*, 47 AD3d 406 [2008]; *Matter of Lewis v Doherty*, 294 AD2d 247 [2002]; *Matter of Powell v City of Newburgh*, 284 AD2d 334, 334 [2001]; *Matter of Brown v City of New York*, 250 AD2d 546, 546 [1998]; *Matter of Atkinson [B.C.C. Assoc.—Hudacs]*, 185 AD2d 415, 415-416 [1992]), the forfeiture of retirement benefits and pension earned throughout the course of a lifetime of service (*see e.g. Matter of McDougall v Scoppetta*, 76 AD3d 338, 342 [2010], *lv granted* 16 NY3d 704 [2011]), and the elimination of prospective employment opportunities (*see e.g. Matter of Wai Lun Fung v Daus*, 45 AD3d 392, 392 [2007]; *Matter of Stephens v Suffolk County Dept. of Civ. Serv.*, 15 AD3d 589, 589-590 [2005]). Moreover, a positive toxicology result may bear heavily on child custody decisions (*see e.g. Matter of Horan v Framolaro*, 46 AD3d 891, 891-892 [2007]), or contribute to the complete termination of parental rights (*see e.g. Matter of Nassau County Dept. of Social Servs. v Denise J.*, 87 NY2d 73, 79-80 [1995]; *Matter of Angelica G. [Frank G.]*, 74 AD3d 470 [2010]; *Matter of Maranda LaP.*, 23 AD3d 221, 222 [2005]). Furthermore, as relevant here, an individual may be locked in a prison or otherwise deprived of the

fundamental right to freedom as a consequence of the results of a single drug test (*see e.g. Matter of State of New York v Jason H.*, 82 AD3d 778 [2011]; *People v Whalen*, 1 AD3d 633, 634-635 [2003]; *People v Kraft*, 278 AD2d 591, 591 [2000]; *People v Puma*, 97 AD2d 740 [1983]). In sum, we cannot help recognizing that a positive toxicology result may have far-reaching, permanent, and devastating effects on, among other things, an individual's livelihood, family life, and liberty.

These cases illustrate the extent to which the results of drug tests pervade numerous aspects of individuals' lives. We also note a study by the United States Department of Health and Human Services which determined that an estimated 54 million full-time workers reported that their employer tested for illicit drug use and an estimated 38.7 million full-time workers reported that their employer conducted testing for alcohol use (*see* Larson et al., *Worker Substance Use and Workplace Policies and Programs*, Substance Abuse and Mental Health Services Administration, Office of Applied Studies [DHHS Publication No. SMA 07-4273, Analytic Series A-29], available at http://www.samhsa.gov/data/work2k7/work.htm). Although these numbers are by no means definitive or comprehensive, they nevertheless serve to indicate the extent to which drug testing has proliferated since its relatively recent inception.

Given the importance drug testing holds in the management of modern affairs and the costs that inaccuracies may exact on society, it is paramount that incentives exist to minimize the risk of erroneous test results. However, we are unaware of any legislative remedies extended to test-subjects who are victims of negligent drug testing (*see Drake v Laboratory Corp. of Am. Holdings*, 458 F3d 48, 57 [2d Cir 2006]; *Burton v Southwood Door Co., MEA, Inc.*, 305 F Supp 2d 629, 637-638 [SD Miss 2003]; *Santiago v Greyhound Lines, Inc.*, 956 F Supp 144, 151-152 [ND NY 1997]; *cf.* 49 USC § 31306; Public Health Law §§ 577-579; *Hall v United Parcel Serv. of Am.*, 76 NY2d 27 [1990]).

Nor do we perceive adequate incentives in the operation of market forces. Drug testing has been described as "a multi-million dollar growth industry for test equipment manufacturers, laboratories, consultants, and even private physicians" (Rothstein, *Workplace Drug Testing: A Case Study in the Misapplication of Technology*, 5 Harv J Law & Tec 65, 87 [1991]). One past estimate of the cost of testing employees for drugs fixed the total at one billion dollars annually (*see* Lockard, *Protecting Medical Laboratories from Tort Liability for Drug Testing*, 17 J Legal Med 427, 427 [1996]).

It has been recognized that since accuracy in drug testing is positively related to cost, "laboratories that are willing to skip expensive double-checking procedures can undercut those that are not, thereby [offering] cheaper testing with the only disadvantage being a higher false positive rate" (Manfield, *Imposing Liability on Drug Testing Laboratories for "False Positives": Getting Around Privity*, 64 U Chi L Rev 287, 292 [1997]). Thus, where the subject of a drug test is not a contracting party and there is insufficient concern about false positives, the test subject's preference for increased accuracy may be outweighed by the contracting parties' cost concerns (*id.*; *cf. Palka v Servicemaster Mgt. Servs. Corp.*, 83 NY2d at 589).

We note that numerous other states have already recognized a duty running from a drug testing laboratory to a noncontracting individual whose biological specimen was tested for the presence of drugs (*see Webster v Psychemedics Corp.*, 2011 WL 2520157, \*6, 2011 Tenn App LEXIS 335, \*19 [Ct App 2011]; *Sharpe v St. Luke's Hosp.*, 573 Pa 90, 821 A2d 1215 [2003]; *Berry v National Med. Servs., Inc.*, 41 Kan App 2d 612, 205 P3d 745 [2009], *affd* 292 Kan 917, 257 P3d 287 [2011]; *Duncan v Afton, Inc.*, 991 P2d 739 [Wyo 1999]; *Stinson v Physicians Immediate Care, Ltd.*, 269 Ill App 3d 659, 646 NE2d 930 [1995]; *Nehrenz v Dunn*, 593 So 2d 915 [La 1992]; *see also Garlick v Quest Diagnostics, Inc.*, 2009 WL 5033949, 2009 US Dist LEXIS 116452 [D NJ 2009]; *Quisenberry v Compass Vision, Inc.*, 618 F Supp 2d 1223 [SD Cal 2007]; *Chapman v Labone*, 460 F Supp 2d 989 [SD Iowa 2006]). In addition, we find persuasive the analysis of federal courts which have concluded that New York courts would recognize such a duty under state law (*see Drake v Laboratory Corp. of Am. Holdings*, 2007 WL 776818, 2007 US Dist LEXIS 17430 [ED NY 2007], *affd* 417 Fed Appx 84 [2011]; *Coleman v Town of Hempstead*, 30 F Supp 2d 356, 365 [ED NY 1999]; *Santiago v Greyhound Lines, Inc.*, 956 F Supp at 151-152 [ND NY 1997]). Although these cases involve employees who allegedly lost their employment as a result of negligent drug testing, the reasoning underlying the decision in these cases to impose a duty on drug testing laboratories is certainly no less compelling when an individual's liberty interests are at stake.

In conclusion, we hold that a drug testing laboratory may be held liable in tort to the subject of a drug test for failing to use reasonable care under the circumstances, notwithstanding the absence of a formal contractual relationship between the drug testing laboratory and the subject of the drug test. Accordingly,

the plaintiff's complaint alleges a cause of action for negligence sufficient to withstand the defendant's motion to dismiss for failure to state a cause of action. To the extent that the defendant contends that the plaintiff failed to adequately plead actual injury or damages, its contention is without merit (*accord Estate of Schneider v Finmann*, 15 NY3d at 309; *Prudential Ins. Co. of Am. v Dewey, Ballantine, Bushby, Palmer & Wood*, 80 NY2d at 383-385; *Ossining Union Free School Dist. v Anderson LaRocca Anderson*, 73 NY2d at 419; *Glanzer v Shepard*, 233 NY at 239; cf. *Dombrowski v Bulson*, 79 AD3d 1587 [2010]; *Schneider v Hand*, 296 AD2d 454 [2002]). Accordingly, the order is reversed insofar as appealed from, on the law, and that branch of the defendant's motion which was to dismiss the complaint pursuant to CPLR 3211 (a) (7) is denied.

Angiolillo, J.P., Florio and Leventhal, JJ., concur.

Ordered that the order is reversed insofar as appealed from, on the law, with costs, and that branch of the defendant's motion which was to dismiss the complaint pursuant to CPLR 3211 (a) (7) is denied.