[22 NYS3d 190]

B.F. et al., Respondents, v Reproductive Medicine Associates of New York, LLP, et al., Appellants.

First Department, December 17, 2015

**APPEARANCES OF COUNSEL**

*Mauro Lilling Naparty LLP*, Woodbury (*Caryn L. Lilling* and *Katherine Herr Solomon* of counsel), for Reproductive Medicine Associates of New York, LLP, appellant.

*Aaronson Rappaport Feinstein & Deutsch, LLP*, New York City (*Elliott J. Zucker* of counsel), for Alan B. Copperman, M.D., appellant.

*Lieff Cabraser Heimann & Bernstein, LLP*, New York City (*Wendy R. Fleishman, Daniel R. Leathers* and *Jeremy J. Troxel* of counsel), for respondents.

## OPINION OF THE COURT

FRIEDMAN, J.P.

This is a medical malpractice action for "wrongful birth" (*see Foote v Albany Med. Ctr. Hosp.*, 16 NY3d 211, 214 [2011]; *Becker v Schwartz*, 46 NY2d 401, 412-413 [1978]), in which it is alleged that defendants' failure to perform adequate genetic screening of an egg donor for an in vitro fertilization resulted in the conception and birth of plaintiffs' impaired child. The primary question raised on this appeal is whether plaintiffs' wrongful birth cause of action accrued upon the termination of defendants' treatment of the plaintiff mother, less than two months after the implantation of the embryo, or upon the birth of the infant several months later. We hold that the wrongful birth claim accrued upon the birth of the infant and, therefore, was not barred by the applicable statute of limitations (CPLR 214-a) when this action was commenced within 2½ years after the birth. Accordingly, we affirm the order appealed from insofar as it denied defendants' motion to dismiss the cause of action for medical malpractice.[1]

Plaintiffs, who had been unable to achieve pregnancy naturally, first consulted with defendant Alan Copperman, M.D., at defendant Reproductive Medicine Associates of New York, LLP (RMA), in February 2008, and subsequently placed themselves on RMA's waiting list for an egg donor. Plaintiffs were told that RMA screened donor candidates for genetic diseases and other conditions, but the particular conditions for which candidates were tested were not discussed with them. Plaintiffs were told, however, that some risk of birth defects would remain notwithstanding the screening.

In October 2008, plaintiffs were matched with a donor, whom they accepted. In December 2008, plaintiffs signed a consent form to go forward with the in vitro fertilization procedure. The consent form contains, among other provisions, a representation that plaintiffs "understand that the risk of major birth defects following the use of donor oocytes (eggs) appears to be the same as in the general population."

On January 21, 2009, two embryos, each produced by fertilizing a donated ovum with the plaintiff father's sperm, were implanted in the plaintiff mother. Shortly thereafter, it was confirmed that the plaintiff mother was pregnant with twins. The plaintiff mother had her last appointment at RMA on

---

1. Other issues raised by this appeal are addressed at the conclusion of this writing.

March 10, 2009, and thereafter treated with an obstetrician unaffiliated with defendants for the remainder of the pregnancy. On September 25, 2009, the plaintiff mother gave birth to twin boys.

In February 2010, after Dr. Copperman received information that plaintiffs' donor might have a genetic mutation, RMA tested the donor for a chromosomal abnormality known as "fragile X," which can produce intellectual disability and other deficits, particularly in males. The donor, who had not been tested for fragile X before donating her eggs to plaintiffs, was shown to be a fragile X carrier. The following May, Dr. Copperman called the plaintiff mother and told her that her egg donor was a fragile X carrier. Plaintiffs then had their sons tested and found that one of the boys (M.F.) had the full fragile X mutation.

In December 2011, plaintiffs commenced this action against RMA and Dr. Copperman, asserting 12 causes of action. RMA and Dr. Copperman moved separately to dismiss the complaint pursuant to CPLR 3211 (a) (5) and (7). Supreme Court granted the motions to the extent of dismissing the seventh through twelfth causes of action (from which plaintiffs have not appealed), but otherwise denied the motions, leaving pending plaintiffs' first six causes of action, which are denominated, in order, "fraudulent concealment," "medical negligence," "negligence," "common law fraud," "negligent misrepresentation" and "breach of contract." The court also denied defendants' motions insofar as they sought to strike the complaint's prayer for punitive damages. Defendants have appealed.

Initially, defendants ask us to dismiss "any claims which may be construed to be asserted on behalf of M.F.," plaintiffs' impaired child. Defendants are correct that any cause of action brought against them on behalf of M.F. would amount to a "wrongful life" claim not cognizable under New York law (see *Becker*, 46 NY2d at 408-412), since the harm alleged by the complaint is M.F.'s conception and birth. Under *Becker*, parents may not bring a claim on behalf of an impaired child on the theory that the child himself or herself (as opposed to the parents) would have been better off had the child never come into being. However, while M.F. is named as an infant plaintiff in the caption of the action, the only two causes of action that the complaint asserts on his behalf—the seventh, for "breach of contract—third-party beneficiary," and the tenth, for "breach of express and implied warranties—third-party beneficiary"—

were dismissed by Supreme Court as legally insufficient pursuant to CPLR 3211 (a) (7) and, as previously noted, plaintiffs have not taken an appeal from Supreme Court's order. Accordingly, M.F.'s lack of any cognizable claim against defendants provides no occasion for disturbing the order appealed from, which properly dismissed all claims asserted on M.F.'s behalf.

While an impaired child may not recover damages "dependent upon a comparison between the Hobson's choice of life in an impaired state and nonexistence" (*Becker*, 46 NY2d at 412), the child's parents may seek to recover their past and future "extraordinary financial obligations relating to the care" of that child during his or her minority (*Foote*, 16 NY3d at 215). To recover such damages on a wrongful birth cause of action, "the parents must establish that malpractice by a defendant physician deprived them of the opportunity to terminate the pregnancy within the legally permissible time period, or [as alleged here] that the child would not have been conceived but for the defendant's malpractice" (*Mayzel v Moretti*, 105 AD3d 816, 817 [2d Dept 2013]). In this case, the second cause of action asserted in plaintiffs' complaint, denominated "medical negligence," states a wrongful birth cause of action, based principally on allegations (1) that defendants' failure to test the egg donor for fragile X was a deviation from the applicable medical standard of care and (2) that defendants failed to obtain plaintiffs' informed consent to the procedure inasmuch as they did not disclose to plaintiffs that the egg donor had not been tested for fragile X. The question is whether this claim is barred by the statute of limitations.

CPLR 214-a provides in pertinent part:

> "An action for medical, dental or podiatric malpractice must be commenced within two years and six months of the act, omission or failure complained of or last treatment where there is continuous treatment for the same illness, injury or condition which gave rise to the said act, omission or failure."

As noted, the embryos arising from the donated eggs were implanted in the plaintiff mother on January 21, 2009; the last date on which defendants treated the plaintiff mother was March 10, 2009; and plaintiff's impaired son was born on September 25, 2009. This action, however, was not commenced until December 2011. Thus, if plaintiffs' wrongful birth claim accrued upon the birth of their son, it has been timely asserted; if the claim accrued upon defendants' last treatment of the plaintiff mother, it is untimely.

The Court of Appeals has not addressed the question of when a wrongful birth cause of action accrues. In *LaBello v Albany Med. Ctr. Hosp.* (85 NY2d 701 [1995]), however, the Court of Appeals held that "an infant plaintiff's medical malpractice cause of action, premised on alleged injurious acts or omissions occurring prior to birth, accrues on the earliest date the injured infant plaintiff could juridically assert the claim and sue for relief, that is, the date of being born alive" (*id.* at 703). While plaintiffs rely heavily on *LaBello*, defendants correctly point out that *LaBello*, which hinged on the principle that "an infant plaintiff has no right of action unless born alive" (*id.* at 704), does not control the present question concerning the time of accrual of a cause of action belonging to two adults, each of whom was fully capable of bringing suit at all relevant times.[2]

In arguing that plaintiffs' wrongful birth cause of action accrued at the time of the alleged malpractice, or at the time of the conclusion of the course of treatment that included the alleged malpractice, defendants rely on a different Court of Appeals decision, *Jorge v New York City Health & Hosps. Corp.* (79 NY2d 905 [1992]). In *Jorge*, the plaintiff alleged that, but for a false negative reading of a sickle cell anemia test of the father of her unborn child, she would have terminated her pregnancy, which, when carried to term, resulted in the birth of a child afflicted with sickle cell anemia. In reversing this Court and dismissing the *Jorge* complaint as time-barred on the ground that the plaintiff's subsequent obstetric treatment did not toll the statute of limitations under the continuous treatment doctrine (*id.* at 906), the Court of Appeals implicitly

2. In spite of the fact that the question of when a wrongful birth claim accrues is not addressed in *LaBello*, the Second Department has cited that case in support of a holding that a wrongful birth cause of action "accrued at the time of birth, rather than at the time of the earlier alleged malpractice" (*Ciceron v Jamaica Hosp.*, 264 AD2d 497, 498 [2d Dept 1999]). In *Pahlad v Brustman* (33 AD3d 518, 519 [1st Dept 2006], *affd* 8 NY3d 901 [2007]), this Court cited *Ciceron* in support of its statement that a cause of action for wrongful birth (the decision's use of the term "wrongful life" appears to be a misnomer) accrues at the time of the infant's birth. The statement in *Pahlad*, however, is dictum, since the action (which the majority held to be time-barred) was commenced more than three years after the child was born (*see id.* at 518-519). In a more recent decision, we affirmed Supreme Court's determination that Colorado law applied to a wrongful birth action on the ground that "the last events necessary to make defendants liable, namely the birth and treatment of the subject child, occurred in Colorado" (*Fonda v Wapner*, 103 AD3d 510, 511 [1st Dept 2013]), but our *Fonda* decision does not provide further analysis of why the child's birth was "necessary to make defendants liable."

took the position that the wrongful birth claim accrued before the child was born. However, so far as can be discerned from the opinions issued in *Jorge* by the Court of Appeals and by this Court, the plaintiff in that case did not argue that her claim accrued only upon the birth of the child, without regard to the applicability of the continuous treatment doctrine.

■ We hold that a cause of action for wrongful birth accrues upon the birth of the impaired child, which renders the medical malpractice claim in this case timely. In a decision holding that parents could not recover the ordinary costs of raising a healthy, normal child born as the result of the failure of a surgical contraceptive procedure, the Court of Appeals made the following observation: "Liability for negligent conduct exists only when it proximately causes legal harm to a fully protected interest of another" (*O'Toole v Greenberg*, 64 NY2d 427, 431 [1985]; *see also id.* at 432 [to have a viable cause of action, plaintiffs "must show not only *injuria*, namely, the breach of the defendant's obligation, but also *damnum* to themselves in the sense of damage recognized by law" (internal quotation marks omitted)]). In the case of a claim for wrongful birth, "the parents' legally cognizable injury is the increased financial obligation" of raising an impaired child (*Foote*, 16 NY3d at 215 [internal quotation marks omitted]), as previously discussed. Whether this legally cognizable injury will befall potential parents as the result of the gestation of an impaired fetus cannot be known until the pregnancy ends. Only if there is a live birth will the injury be suffered. Thus, until there is a live birth, the existence of a cognizable legal injury that will support a wrongful birth cause of action cannot even be alleged.[3] Without legally cognizable damages, there is no legal right to relief, and "the Statute of Limitations cannot run until there is a legal right to relief" (*LaBello*, 85 NY2d at 704 [internal quotation marks and brackets omitted]). Accordingly, the statute of limitations begins to run on a wrongful birth claim upon the live birth of an impaired child, whose care and support will occasion the pecuniary damages the parents may seek to recover.

Although, for the reasons discussed above, Supreme Court correctly denied the motion to dismiss plaintiffs' second cause of action, for medical malpractice, we modify to grant the motion to dismiss their causes of action for ordinary negligence,

---

**3.** Even if knowledge of the impairment of the fetus would not have prompted the parents to choose to terminate the pregnancy, the natural course of any pregnancy is a matter of substantial uncertainty.

breach of contract, fraud and negligent misrepresentation, which are all essentially redundant of the medical malpractice claim. Each of the non-malpractice claims is based upon the same alleged conduct as the medical malpractice claim (defendants' screening and choice of an egg donor for an in vitro fertilization and advice to plaintiffs concerning the risks of the procedure); each non-malpractice claim will depend upon the same expert evidence as the malpractice claim; and each non-malpractice claim seeks recovery for the same injury as the malpractice claim (the additional expense of raising a child affected by fragile X syndrome).

■ We turn first to the negligence claim. In a very recent decision holding that a laboratory's misreading of a tissue sample constituted medical malpractice rather than ordinary negligence, this Court observed: "It is settled that a negligent act or omission 'that constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician constitutes malpractice' " (*Annunziata v Quest Diagnostics Inc.*, 127 AD3d 630, 631 [1st Dept 2015], quoting *Bleiler v Bodnar*, 65 NY2d 65, 72 [1985]). Here, defendants' screening of plaintiffs' egg donor, even if it could plausibly be viewed as not constituting medical treatment itself, indisputably bears a substantial relationship to the rendition of medical treatment by a licensed physician and therefore, under our precedents, constitutes medical malpractice.[4] Moreover, while a medical facility's conduct may be actionable as ordinary negligence "where the alleged negligent act may be readily determined by the trier of the facts based on common knowledge" (*Coursen v New York Hosp.-Cornell Med. Ctr.*, 114 AD2d 254, 256 [1st Dept 1986]), this is not the case here, given that plaintiffs, to prove their claim, must proffer expert testimony concerning the standard of care for the screening of egg donors.[5]

---

4. We are not persuaded by the partial dissent's attempt to distinguish *Annunziata* on the ground that the wrongful conduct there was the misreading of a tissue sample, while here the challenged conduct is the failure to order a particular test in the first place. Deciding which medical test to order, no less than reading the test results, requires medical knowledge and judgment.

5. The cases cited by our partially dissenting colleague do not support her view that defendants' allegedly inadequate screening of plaintiffs' egg donor is cognizable as ordinary negligence. In *Weiner v Lenox Hill Hosp.* (88 NY2d 784 [1996]), the defendant hospital's alleged "fail[ure] to properly safeguard its blood supply from HIV contamination" (*id.* at 786) was held to constitute

■ The cause of action for breach of contract must also be dismissed as legally redundant of the malpractice claims because plaintiffs do not allege that defendants, "within the context of . . . [the] treatment, . . . expressed a specific promise to accomplish some definite result" (*Leighton v Lowenberg*, 103 AD3d 530, 531 [1st Dept 2013]; *see also Scalisi v New York Univ. Med. Ctr.*, 24 AD3d 145, 147 [1st Dept 2005] [same]). Indeed, the consent to the in vitro fertilization that plaintiffs signed, while it contains no guarantee that any resulting child would be free of birth defects, does include a representation by plaintiffs that they "underst[ood] that the risk of major birth defects following the use of donor oocytes (eggs) appears to be the same as in the general population." In essence, the breach-of-contract claim is based on nothing more than the allegation that defendants promised to carry out the treatment in accord with the prevailing medical standard of care. If plaintiffs' claim were cognizable as a breach of contract claim, then every medical malpractice claim arising from a voluntary physician-patient relationship could be pleaded in the alternative as a breach of contract.

Finally, plaintiffs assert a "fraudulent concealment" cause of action based on defendants' alleged failure to disclose that the egg donor had not been screened for fragile X syndrome, that the donor was a fragile X carrier, and that the in vitro fertilization procedure involved a risk that the egg donor would be a fragile X carrier. In addition, plaintiffs assert a fraud cause of action based on defendants' representation that the institutional defendant had "a rigorous donor screening program" and

---

ordinary negligence because it was not part of "the rendition of medical treatment to a particular patient" (*id.* at 788 [internal quotation marks omitted]). Similarly distinguishable is *Rodriguez v Saal* (43 AD3d 272 [1st Dept 2007]), in which a claim against the New York Organ Donor Network (NYODN) for inadequately testing and screening organs for transplant was held to constitute ordinary negligence because "NYODN did not provide any type of medical treatment directly to [the] decedent" (*id.* at 274). The claim against the hospital for "improper or inadequate hiring practices and administrative procedures" in *Bleiler v Bodnar* (65 NY2d at 72), which conduct was held to constitute ordinary negligence, put in question the hospital's administrative competence, not the professional competence of its medical personnel. Finally, completely irrelevant to the issues raised on this appeal is *Landon v Kroll Lab. Specialists, Inc.* (91 AD3d 79 [2d Dept 2011], *affd* 22 NY3d 1 [2013]), which involved a claim against a forensic drug testing laboratory for producing a false positive result. The *Landon* plaintiff had been required to submit to drug testing as a condition of his probation, and neither side contended that the drug test performed by the laboratory bore any relationship to a course of medical treatment.

that all of its donors had "a good genetic history." A negligent misrepresentation claim is predicated on the same alleged facts. These allegations simply recapitulate the medical malpractice allegations and do not make out independent fraud or negligent misrepresentation claims, since the injury for which recovery is sought is identical to the injury alleged in support of the medical malpractice claim (*see Roswick v Mount Sinai Med. Ctr.*, 22 AD3d 409, 410 [1st Dept 2005]; *Atton v Bier*, 12 AD3d 240, 241 [1st Dept 2004]). The partial dissent's theory that the causes of action for misrepresentation and breach of contract are cognizable because they seek damages other than the damages sought by the medical malpractice cause of action is not reflected in the complaint or in plaintiffs' appellate brief.[6]

Finally, plaintiffs have adequately pleaded a basis for an award of punitive damages in this case, given their allegations that fragile X is a common cause of mental retardation for which donor candidates could easily have been tested, and given that defendants' failure to screen for fragile X potentially affected many patients other than plaintiffs (*see Home Ins. Co. v American Home Prods. Corp.*, 75 NY2d 196, 203-204 [1990]).

Accordingly, the order of the Supreme Court, New York County (Joan B. Lobis, J.), entered January 7, 2014, which, to the extent appealed from as limited by the briefs, denied defendants' motions to dismiss the first six causes of action of the complaint and to strike the demand for punitive damages, should be modified, on the law, to grant the motions to the extent of dismissing the first, third, fourth, fifth and sixth causes of action, and otherwise affirmed, without costs.

MANZANET-DANIELS, J. (concurring in part and dissenting in part). I concur in the majority's reasoning that the parents'

---

**6.** The fraudulent concealment claim is not saved by the allegation that defendants did not immediately inform plaintiffs of the donor's carrier status upon learning of it, since the record establishes (and plaintiffs do not dispute) that defendants did not become aware that the donor was a fragile X carrier until after the child's birth. At that point, plaintiffs could no longer avoid the harm for which they seek to recover. Given that we are rejecting defendants' argument that the malpractice claims are time-barred, defendants' delay in informing plaintiffs of the donor's carrier status has no effect on the timeliness of this action. We note, however, that the Court of Appeals has long held that "concealment by a physician or failure to disclose his own malpractice does not give rise to a cause of action in fraud or deceit separate and different from the customary malpractice action, thereby entitling the plaintiff to bring his action within the longer period limited for such claims" (*Simcuski v Saeli*, 44 NY2d 442, 452 [1978]).

claims accrued upon the birth of their son with fragile X syndrome, and thus are timely. I also concur that plaintiff parents have adequately pleaded a basis for punitive damages. However, I dissent insofar as I believe that it cannot be determined on this motion to dismiss whether additional causes of action alleged are duplicative of or subsumed within the cause of action alleging medical malpractice (*see Newell v Ellis Hosp.*, 117 AD3d 1139 [3d Dept 2014]). "[T]he distinction between medical malpractice and negligence is a subtle one, for medical malpractice is but a species of negligence and no rigid analytical line separates the two" (*Weiner v Lenox Hill Hosp.*, 88 NY2d 784, 787 [1996] [internal quotation marks omitted]).

This case arises from defendants' alleged failure to screen an egg donor for fragile X syndrome before implantation of the donor's fertilized egg into the plaintiff mother. Plaintiffs allege that they would have used a different egg donor if they had known that their donor was a fragile X carrier.

The mother was treated by defendants through March or April of 2009, and had twin boys born on September 25, 2009. After learning that one of the children had fragile X syndrome, plaintiffs commenced this action against Reproductive Medicine Associates of New York, LLP (RMA) and Dr. Copperman on December 6, 2011, within 2½ years after the child's birth.

Plaintiffs B.F. and Steven F.—husband and wife—began treating at RMA for in vitro fertilization services in February 2008. Plaintiffs claim to have repeatedly asked Dr. Copperman if defendants were testing the egg donors for birth defects, as Mr. F. worked with special needs children and was particularly concerned about the issue.

Defendants represented to plaintiffs that donors go through a "rigorous screening process" that includes genetic testing, and Dr. Copperman assured them that "to the extent possible," every possible effort was made to "screen donors for genetic mutations that would cause conditions of mental retardation." During a donor workshop, RMA employees made further representations that all donors in the program were subjected to rigorous medical examination and genetic testing to ensure that they were healthy. Plaintiffs claim that in reliance on these representations they chose to proceed with a shared donor cycle at the cost of $21,830, which included "genetic consultation and screening" of the donor.

Plaintiffs were offered an egg donor in November 2008, and were told that the donor had cleared the screening process. A nurse from RMA told plaintiffs that the donor had donated several times before, which had resulted in a number of successful pregnancies and healthy babies. The next month the donor's eggs were retrieved, fertilized, and implanted into Mrs. F. Mrs. F.'s pregnancy was confirmed in the beginning of January 2009. The pregnancy continued without incident, and she gave birth to twin boys on September 25, 2009.

Initially plaintiffs did not have any concerns about the health of their sons. On May 10, 2010, however, Dr. Copperman called the plaintiff mother and informed her that their egg donor was a fragile X carrier. After consulting with a geneticist and having their sons tested, plaintiffs learned that their son M.F. had a full fragile X mutation.

Fragile X mutation is an inherited cause of mental impairment. Plaintiffs allege that it is "by far the most common type of known inherited mental retardation in male children," and that a simple blood test costing $100-$200 has been readily available since 1992 to test for this condition. As the disease is only passed through the female's X chromosome, M.F.'s fragile X mutation must have been inherited from the egg donor and not from his father.

According to the complaint, those affected with a fragile X mutation range from having "learning disabilities to severe mental retardation and autism." There are other behavioral, intellectual and social characteristics to those afflicted with fragile X, including speech, language, and motor delay, tactile defensiveness and sensory overload, and abnormal physical features. Infant M.F.'s full fragile X mutation requires "intensive physical, occupational, speech and behavioral therapies for several hours a day, five times per week." According to plaintiffs, he will require special education services for the rest of his life, and will most likely never live independently. Plaintiffs allege that they would have insisted on using an egg from a different donor had they known that their donor was a carrier of fragile X.

Plaintiffs commenced this action in December 2011. The complaint alleges 12 causes of action against defendants, six of which are relevant on appeal. The first cause of action, for fraudulent concealment, alleges that defendants withheld information from plaintiffs that would have revealed that their egg donor had not been screened for fragile X syndrome, and

that the donor was in fact a fragile X carrier. When defendants became aware that the egg donor was a fragile X carrier, plaintiffs contend that they suppressed and concealed this information until finally disclosing the information to them in May 2010.

The second cause of action, for medical malpractice, alleges that defendants carelessly and negligently failed to test the egg donor for fragile X, and departed from proper standards of care by failing to report to plaintiffs that they either "could not or would not properly screen egg donors for the leading cause of inherited severe mental retardation." Similarly, in the third cause of action, for negligence, plaintiffs allege that defendants failed to promulgate rules and procedures for testing, and failed to warn plaintiffs that testing was not conducted regularly on the egg donors in their program.

In the fourth cause of action, for common-law fraud, plaintiffs allege that defendants misrepresented their testing protocols in their written materials, and falsely represented facts regarding screening procedures. In the fifth cause of action, for negligent misrepresentation, plaintiffs allege that defendants, acting with a special relationship, induced plaintiffs, through brochures and other written materials that carelessly misrepresented that they had a "rigorous donor screening program" with all donors having a good genetic history, to avail themselves of defendants' services. In the sixth cause of action, for breach of contract, plaintiffs allege that the parties entered into a contract for a suitable donor in exchange for good and valuable consideration, and that defendants breached that contract by failing to screen the egg donor for fragile X.*

The claims for negligence, breach of contract, fraudulent concealment, common-law fraud and negligent misrepresentation are sufficiently pleaded and are not duplicative of the medical malpractice claim. The negligence claim involves defendants' alleged failure to adopt proper procedures to provide screening and testing of an egg donor for fragile X. The claim arguably implicates a duty different from that implicated in the medical malpractice claim. Claims contesting the adequacy

---

\* The complaint alleged six other causes of action, for breach of contract on behalf of a third-party beneficiary (the child), breach of the express and implied warranties of merchantability on behalf of the parents and on behalf of the child, strict products liability for failure to warn, and negligent infliction of emotional distress. These have all been dismissed from the case and are not relevant on appeal.

of blood testing and screening procedures sound in negligence, not malpractice (*see Weiner v Lenox Hill Hosp.*, 88 NY2d at 788 [provider's failure to properly safeguard its blood supply from HIV contamination sounded in negligence, not malpractice, and was subject to three-year statute of limitations]; *Bleiler v Bodnar*, 65 NY2d 65, 66 [1985] [failure to promulgate appropriate rules and procedures "sounds in negligence, and is subject to the three-year limitations period . . . rather than the shorter medical malpractice limitations period"]). Claims contesting the adequacy of an organ procurer's testing and screening procedures have similarly been found to sound in negligence (*see Rodriguez v Saal*, 43 AD3d 272 [1st Dept 2007] [failure to properly screen donated kidney resulting in the transplant of a diseased kidney with extensive tumor infiltration sounded in negligence]; *see also Landon v Kroll Lab. Specialists, Inc.*, 91 AD3d 79 [2d Dept 2011] [negligence action against drug testing laboratory for negligently conducting drug screen and reporting erroneous positive result], *affd* 22 NY3d 1 [2013]).

The complaint alleges that defendants failed to employ a simple and readily available blood test to screen for fragile X, which they claim to be "by far the most common type of known inherited mental retardation in male children." The failure to order a simple blood test—as opposed to, perhaps, the faulty performance of the test itself—is within "the ken of the average juror" and does not involve "medical competence or judgment" (*Weiner*, 88 NY2d at 788-789). *Annunziata v Quest Diagnostics Inc.* (127 AD3d 630 [1st Dept 2015]), cited by the majority, involved the misreading of a Pap smear tissue sample, and not the failure to order or perform the test in the first instance as is the case here.

Defendants' argument that the non-negligence claims were duplicative of other claims is not persuasive, as they capture distinct allegations resulting in separate damages. The allegations unrelated to the medical malpractice cause of action include those related to material misrepresentations made by defendants in their brochure and sales materials to induce plaintiffs to purchase their goods and services in the first instance. The damages sustained on account of defendants' breach of contract (the cost of the in vitro fertilization) are different from the damages sounding in wrongful life (the extraordinary cost of raising a disabled child), which are separate and apart from those sounding in fraud (which, as the

court found, may include punitive damages). At this stage, on a CPLR 3211 motion to dismiss, plaintiffs have adequately detailed in their complaint and brief how distinct "actions worked to produce a separate and distinct harm," the majority's assertions to the contrary notwithstanding. The representation in the consent to in vitro fertilization that plaintiffs "underst[ood] that the risk of major birth defects following the use of donor oocytes (eggs) appears to be the same as in the general population," in no way negates defendants' promise, as alleged in the complaint, to test all donors for all possible known causes of mental disturbances or mental retardation.

SAXE, FEINMAN and GISCHE, JJ., concur with FRIEDMAN, J.P.; MANZANET-DANIELS, J., concurs in part and dissents in part.

Order, Supreme Court, New York County, entered January 7, 2014, modified, on the law, to grant the motions to the extent of dismissing the first, third, fourth, fifth and sixth causes of action, and otherwise affirmed, without costs.